CHARLOTTE PLATTER, Administratrix of the Estate of GUY PLATTER, Deceased, Appellee, v. MINNEAPOLIS & ST. LOUIS RAILROAD COMPANY, Appellant.

**Railroads:** CROSSING ACCIDENT: NEGLIGENCE: EVIDENCE. In this
1   action for the death of one killed at a railway crossing by a passing train, the evidence of defendant's negligence in operating the train at an unlawful rate of speed, in failing to give warning signals, and in not having the headlight of the engine burning, was sufficient to take the case to the jury, although plaintiff's evidence in the two latter respects was negative in character and there was positive testimony to the contrary.

**Same:** EVIDENCE: HABITS AND CUSTOM OF DECEDENT. Where there
2   were no eyewitnesses to a railway crossing accident resulting in death, evidence of decedent's habits and custom in exercising care and caution at such crossings is admissible, in support of the presumption of self-preservation.

**Same:** DEATH: INSTINCT OF SELF-PRESERVATION. Where there were eye-
3   witnesses to an accident resulting in death the presumption of care

arising from the instinct of self-preservation does not apply; nor will it obtain if the physical facts and uncontradicted circumstances show that deceased could not have exercised the care required of him at the time of the accident.

**Same.** Where permissible the law indulges the inference that the instinct of self-preservation and love of life prompted a decedent to exercise ordinary care for his safety, but this presumption is not conclusive, and is to be considered in connection with all the evidence in the case.

**Same.** Where by reason of darkness or distance from the scene of accident, or for any other reason, the witnesses were unable to observe the acts and conduct of decedent with respect to his own safety, the jury may consider the instinct of self-preservation in connection with the other evidence in determining whether he exercised ordinary care.

**Evidence:** CREDIBILITY. The jury is not bound to accept as true the testimony of a witness though uncontradicted by other witnesses; but it may consider the means and opportunity of the witness to know the facts testified to, the consistency of his testimony with itself and the other proven facts and circumstances, and apply to it the test of credibility.

**Railroads:** CROSSING ACCIDENT: INSTINCT OF SELF-PRESERVATION. The evidence in this case is reviewed and it is held that the question of whether the deceased was observed by the witnesses during all of the time he was within the zone of danger was for the jury, and that the court rightly instructed that if such was not the fact they might consider the instinct of self-preservation in determining whether he exercised ordinary care.

**Same:** CONTRIBUTORY NEGLIGENCE. A traveler approaching a railway crossing is not bound as a matter of law to look and listen for an approaching train at any particular place; nor is he thus required to look, especially where his view is obstructed. He has the right to rely upon the operation of trains according to law and the ordinances of a city, the burning of a headlight, the ringing of the bell, and at crossings exceptionally dangerous he may rely upon the giving of other warning signals; and if he does so and exercises the ordinary precautions of sight and hearing he is not guilty of contributory negligence as a matter of law.

*Appeal from Boone District Court.*—HON. C. G. LEE, Judge.

FRIDAY, NOVEMBER 14, 1913.

ACTION at law to recover damages for the death of Guy Platter, who was killed by one of defendant's passenger trains at a crossing in the town of Ogden, Iowa, on October 28, 1910. Defendant denied the negligence charged, and pleaded contributory negligence on the part of the deceased. Upon the issues joined, the case was tried to a jury, resulting in a verdict and judgment for plaintiff in the sum of $6,000, and defendant appeals.—*Affirmed.*

*W. H. Bremner* and *F. M. Minor* and *Stevens, Fry & Stevens,* for appellants.

*Frank Porter* and *Goodykoontz & Mahoney,* for appellee.

DEEMER, J.—While many grounds of negligence were charged, the case went to the jury upon the following specifications: "First. That at said time said train was operated in and through the town of Ogden at an unusual, unlawful and excessive rate of speed. Second. That the said train approached said crossing at the point where decedent was struck without giving proper warning of its approach by ringing a bell or blowing a whistle or otherwise. Third. That the defendant company failed and neglected to provide any means of warning to travelers approaching said crossing, notwithstanding the fact that the view of defendant's track northeast from said crossing was partially obstructed by buildings and trees. Fourth. That defendant was negligent in that the headlight of the engine was not lighted, although it was becoming dark at said time, and travelers and especially the said decedent had no means of seeing the said approaching train."

The points relied upon for a reversal relate to rulings on the admission of testimony, to the giving of certain instructions, and to the sufficiency or rather the insufficiency of the testimony to sustain the verdict; the latter claim being based

upon the proposition that there was not sufficient testimony to support the allegations of negligence, and that under the evidence it should be held as a matter of law that the deceased was guilty of contributory negligence.

I. At the time of his death deceased was twenty years of age. He was a farmer and teamster living in the town of Ogden, and when returning from work to his home was struck

1. RAILROADS: crossing accident: negligence: evidence.

at what is known as Third street crossing in the town of Ogden by a passenger train on defendant's road and almost instantly killed. The accident occurred at about 6:15 o'clock

p. m. Deceased was proceeding in a southerly direction to a barn where he kept his team, which was on Third street, and about half a block south of the railway crossing. He was driving a gentle team, and when last seen was standing up in his wagon, facing in a northwesterly direction and driving his team at a slow trot. When he reached the crossing he was struck by an engine drawing a passenger train on the defendant's road, which train was running in a southwesterly direction, and at what is claimed was an unusual and excessive rate of speed, which rate was prohibited by an ordinance of the town. The impact killed one of the horses, broke up the wagon and inflicted injuries which caused the death of the deceased. Third street runs almost due north and south, and the defendant's railway crosses it obliquely, running in a southwesterly direction, upon approximately a 5 per cent. curve for a distance of about two blocks. The attached plat shows the nature of the crossing and also the obstructions to a view of a train running southwesterly by one traveling south upon Third street.

The train which struck the deceased was forty-five minutes late, and plaintiff introduced testimony to show that it was running at from twenty to thirty-five miles per hour when the collision occurred. There was an ordinance of the town fixing the rate of speed through the town at ten miles per hour. Plaintiff also introduced testimony showing that there was no gong or other crossing signal at the crossing save the usual highway crossing sign, and further produced witnesses who testified in effect that no whistle was blown for the crossing, and that the bell was not rung, and testimony was also adduced tending to show that the headlight of the engine was not burning.

The night was dark, and the wind was blowing from the north. The engine and train ran from five hundred to five hundred and fifty feet after the collision, and there was testimony to the effect that, if the train had been running at ten miles per hour, it could have been stopped by the application of the emergency brake within from forty to seventy-five feet. As a matter of fact, it ran the distance before stated after it is claimed the emergency brake was applied.

Upon the question of defendant's negligence in the respects stated in the specifications of negligence submitted to the jury, we think there was sufficient testimony to justify the verdict. The excessive rate of speed is quite conclusively shown by the physical facts, and, while the testimony as to failure to ring the bell and sound the whistle, and to the fact that the headlight was not burning, was negative in character, there was enough to take the case to a jury even in the face of positive testimony to the contrary. *Mackerall v. Railroad Co.,* 111 Iowa, 547; *Morgan v. Railroad,* 151 Iowa, 212. It is agreed that there was no other warning signal of approaching trains at this crossing than the usual highway crossing sign.

The trial court did not err in submitting the issue of defendant's negligence to the jury, or in refusing to grant a new trial because of the insufficiency of the testimony.

II.   The question of deceased's contributory negligence, as submitted in the argument for appellant, involves all the other propositions in the case.   The first point here is that the court erred in receiving testimony as to the habits and custom of the deceased in the matter of using care and caution at railway crossings.   The correctness of this ruling as well as the alleged errors in some of the instructions given depend upon one fundamental proposition:   Were there any eyewitnesses of the transaction?   In *Frederickson v. Railroad Co.*, 156 Iowa, 26, this court said:

2. SAME: evidence: habits and custom of decedent.

A son of the deceased testified that he had ridden with his father over the crossing in question some twenty times or more during the five years immediately preceding the accident, that he knew his father's habit and custom about looking and listening for trains, and that he was in the habit of stopping and looking and listening.   Proper objection was made to this testimony, and appellant now contends that it was error to receive it, because the habits and usual conduct as to a particular act are not admissible on the question of contributory negligence, and because the witness had not shown sufficient familiarity with the habits of the deceased.   The deceased was alone at the time he was killed, and, so far as the record discloses, no one witnessed the accident.   In such cases the presumption obtains that the deceased was exercising due care in approaching the crossing.  This presumption is not conclusive, but is to be considered with other evidence. In *Dalton v. Railroad Co.*, 114 Iowa, 259, and in *Gray v. Railway Co.*, 143 Iowa, 268, we intimated that cases might arise where it would be competent to show the general habit and conduct in such cases as bearing indirectly upon the question of contributory negligence.   The general objection to such evidence is that it is too remote, and that a man may be generally careful in doing a particular thing and still be careless in the instance in question.   But we are of the opinion that evidence of the general habit in using a particular railroad crossing is competent, at least where there are no eyewitnesses of the accident.   It may tend to aid the presumption of self-preservation that arises in such cases, because a

person is more likely to do what he is in the habit of doing under the same conditions. Such evidence is held admissible in New Hampshire, *Tucker v. Boston & M. R. R.,* 73 N. H. 132 (59 Atl. 943); *Davis v. Railroad,* 68 N. H. 247 (44 Atl. 388), and cases therein cited, and in *Illinois Railroad Co. v. Clark,* 108 Ill. 113; *Railroad Co. v. Bailey,* 145 Ill. 159 (33 N. E. 1089). The following cases also support the rule: *Railway Co. v. McNeil* (Ind. App.) 66 N. E. 777; *Railroad Co. v. Spilker,* 134 Ind. 380 (33 N. E. 280, 34 N. E. 218); *Craven v. Railroad Co.,* 72 Cal. 345 (13 Pac. 878); *Fitzpatrick v. Railroad Co.,* 128 Mass. 13; 1 Wigmore on Evidence, sections 92, 93; *Mathias v. O'Neill,* 94 Mo. 520 (6 S. W. 253). As bearing somewhat on the same question, see *Slossen v. Railroad Co.,* 60 Iowa, 215; *Lanning v. Railroad Co.,* 68 Iowa, 502; *Johnson v. Railroad Co.,* 77 Iowa, 666; *Shaber v. Railway Co.,* 28 Minn., 103 (9 N. W. 575); *Smith v. Clark & Whiting,* 12 Iowa, 32; *Stafford v. Oskaloosa,* 64 Iowa, 251.

It is said that the court should have held, as a matter of law, that deceased was guilty of contributory negligence; but we cannot assent to the proposition. While the crossing in question was so open that the approach of a train could have readily been seen by the exercise of care, under ordinary circumstances, the record shows that on the afternoon in question the wind was high, and that at times the air was so full of drifting snow that a person could not see far. What precaution the deceased may have taken when approaching this crossing cannot be certainly determined. But he had used it frequently for many years, and knew that it was dangerous to attempt to cross the track without exercising care, and the presumption that we have already referred to, in connection with evidence of the conditions of the weather at the time, was, we think, sufficient to take the case to the jury. *Lorenz v. Railway Co.,* 115 Iowa, 377; *Funston v. Railway Co.,* 61 Iowa, 452.

Instruction 10 is complained of, on the ground that no fact or circumstance was shown which would serve to excuse 'the failure of the deceased to look and listen for an approaching train.' But the appellant is mistaken as to this. The deceased may have stopped and looked and listened, and still have been unable to see or hear the train on account of the weather conditions shown. Nor is a person approaching a railway crossing required by law to stop, look and listen under all conditions. Such duty is always dependent upon the con-

ditions existing at the time. See cases immediately *supra.* There was no error in the instruction.

Again, it is the rule of this court that the presumption of care arising from the instinct of self-preservation does not apply where there are eyewitnesses of the entire transaction, nor will it obtain if the physical facts and uncontradicted circumstances show that deceased could not have

3. SAME: death: instinct of self-preservation.

exercised the care required of him at the time of the accident. See cases cited in the quotation just made, and *Christopherson v. Railroad Co.,* 135 Iowa, 409; *Brown v. Coal Co.,* 143 Iowa, 662; *Gray v. Railroad Co.,* 143 Iowa, 268; *Meier v. Way & Co.,* 136 Iowa, 302; *Burk v. Walsh,* 118 Iowa, 397; *Bell v. Clarion,* 113 Iowa, 126; *Morbey v. Railroad Co.,* 116 Iowa, 84; *Ellis v. Leonard,* 107 Iowa, 487; *Golinvaux v. Railroad Co.,* 125 Iowa, 652; *Ames v. Railway Co.,* 120 Iowa, 640; *Phinney v. Railroad Co.,* 122 Iowa, 488. Recognizing these rules, the trial court gave the following instructions:

XI. Where a human being is killed by an accident, and there is no eyewitness to the same, the law indulges the inference that the instinct of self-preservation, of the love

4. SAME.

of life, was such as to prompt him to exercise ordinary care for his safety. This inference is not conclusive, but is a matter to be considered by the jury in connection with all the evidence in the case. It is not only indulged in where there is direct credible testimony as to the party's conduct at and prior to the time of the accident, but is only to be considered in connection with the other circumstances shown in evidence with reference to those matters which are not accounted for by credible direct testimony.

XI½. In this case, if you believe from the evidence that, owing to the darkness or the distance of the witness or witnesses who have testified upon the subject from the deceased,

5. SAME.

or for any other reason, they could not observe his acts and conduct or determine whether or not said deceased, Guy Platter, looked or listened for the approaching train, then you will have the right to consider the instinct of self-preservation in connection with the other

facts and circumstances appearing in evidence in determining whether or not in that respect he exercised ordinary care for his safety when he came within the zone of danger. But if you believe that, while he was approaching said crossing, and during the time the duty devolved upon him to look and listen for approaching trains, he was under the scrutiny of some credible witness who observed the acts and conduct of said Platter at such time, then you are bound by the testimony given by such witness on such subject, and should not consider the inference that at the time covered by such testimony the said Guy Platter was prompted in his conduct by the instincts of self-preservation, if such inference is inconsistent with the acts and conduct shown by such direct testimony.

XIII. You are instructed that the fact, if it be a fact, that any eyewitness testifies to any fact or state of facts, and such testimony is not contradicted by the testimony of other witnesses, does not require you to find that such testimony of such witness is true. In determining whether or not a fact or state of facts existed as testified to by such witness, you have a right to take into consideration the means and opportunity of such witness to know the fact or state of facts as testified to by him, the reasonableness or unreasonableness of his testimony, its consistency with itself, and other well-proved facts and circumstances as disclosed by the evidence, and to apply to such testimony the test of credibility of witnesses as is herein authorized to be applied by you.

6. EVIDENCE: credibility.

Although these instructions, particularly 11 and 11½, are challenged, they announce the doctrines heretofore established by this court. But it is strenuously contended for appellant that the instructions were erroneous and inapplicable, because there were eyewitnesses of the transaction. Chief reliance for this claim is upon the testimony of the engineer and of one Larson, both of whom were defendant's witnesses. As much depends upon the testimony of these two witnesses, we here quote the material parts thereof. The witness Larson testified:

7. RAILROADS: crossing accident: instinct of self-preservation.

. . . My home is just north of the place where the accident happened, on the same street and in the same block. It is the third house north of the railroad. It faces to the east. I saw Mr. Platter come along that street going south at that time. I was standing about a hundred feet south from that street running east and west. I was going south at that time, and so was Platter. He was driving a team hitched to a wagon. He was standing up in the wagon. He was facing in a northwesterly direction. He was driving in a small trot. I could see after he passed me until he reached the track. I saw when the collision occurred. He continued to drive in a trot as far as the track. I think he continued in that same position until he got down to the track.

On cross-examination the witness said: Q. About how far is your house from the track? A. I don't know. Q. About how far? A. I would not say, because I don't know. Q. What is your business? A. Maintainer of signals on the Northwestern. . . . Q. When you left your work to go to your home that night, did you walk down Third street all the way from Main or Walnut street? A. Yes. Q. And where were you when Guy Platter passed you? A. I was just about 100 feet south of the street running east and west. Q. How far were you from your own house? A. It was next door; I don't know how many feet, probably about one hundred feet. . . . Q. After you saw him, I suppose you continued on toward your home, did you not? A. Well, sir, I stayed there and watched them. Q. You didn't go to your house? You watched him from the time you saw him? A. He passed me right there, and I watched him. Q. You didn't keep on walking towards your house? A. No, sir. Q. You just stood still when you saw him pass you? A. Yes; while he was by me a little ways. Q. How far? A. I could not say, a couple of hundred feet probably. Q. When you stopped? A. When who stopped? Q. When you stopped? A. Yes. Q. Well, then, from the time you saw him first you may state if you walked some distance south? A. Well, I did. Q. How far did you walk south from the time you saw him? A. About a block and a quarter. Q. Well, then, he passed you a good ways north of Mulberry street, did not he? A. Just about Mulberry street he passed me. Q. You didn't walk a block and a quarter from that time up until the time you had stopped? A. Yes. Q. Did you say a lot and a quarter, or a block and a quarter? A. I walked from Main street down

to where I stopped the first time I saw him.   Q. And he passed you on Main street?   A. No, sir; he passed me on Mulberry street.   Q. I am speaking of the time he passed you on Mulberry street.   From that time how far did you go before you stopped there?   A. About one hundred feet.   Q. And at that time you estimated that he was about two hundred feet south of you?   A. Somewhere around there.   Q. How far from the track was he at that time?   A. I could not say.   Q. Have you any idea?   A. No, sir.   .  .  .   Q. Now, there is a row of trees in front of Mr. Harten's house, is there not?   A. Yes. Q. Those trees are mostly outside of the sidewalk, are they not?   A. Yes.   Q. The branches are pretty low down?   A. All the way from six to seven feet high from the ground. Q. Now, your view of Mr. Platter as he approached the crossing was obstructed by those trees, was it not?   A. It was by my standing up straight.   Q. You stood up straight, didn't you?   A. No, sir.   Q. Did you stoop all the time from the time you stopped until he was struck by the train?   A. No, sir.   Q. You just stopped and saw him drive on there?   A. I stooped over to see whether he was stopping or going on over the crossing.   Q. How long was that before you saw the train? How long was that before you saw him struck, I should say? A. I would not say the time; not over a minute.   Q. Going south?   A. A short time.   Q. Was he far from the crossing then?   A. I could not say.   Q. It was rather dark?   A. It was rather dark; yes.   Q. Do you remember if you testified here the last term of court in this case, Mr. Larson?   A. Yes. Q. How far could you see Mr. Platter as he went down the street so that you could see him clearly?   A. Oh, I don't know; I could see him pretty fair from where I was standing when he was struck.   Q. Do you remember the last term of court you thought you could see him just about opposite Harten's house?   A. I could not see him plainly there.   The closer a man the plainer I can see him.   Q. How did you move from the first position where you stood until the accident happened? A. After it happened I moved, but before, no, sir.   Q. I asked you whether or not you remember whether you were asked this question by Mr. Fry, and that you gave this answer last term of court: 'Q. You say you think you could see him clear down to the crossing, the place where the accident happened?   A. Not standing in that position, the place where I first stooped.'   Do you remember giving that answer?   A. I do, and his question was whether I could see him when he

turned around. Q. Then you could not see him clear down to the crossing? A. I could see him; but I could not see whether he turned around to see whether the train was coming. Q. You didn't see that, so you don't want to be understood by this jury as saying as you came that you could not see that he did not turn around and look to the northeast before he reached the crossing? A. I would not say that he did turn around; I would not say that he did not. Q. You won't say he did not turn around? A. No, sir. Q. You won't testify either way? A. No, sir. Q. He might have turned his head without turning his body? A. I could not swear to that. Q. You could not see him clear enough to tell? A. Not his head. Q. Do you think you could see his body just from where you were standing? A. I am pretty sure I could if I could watch close enough. Q. If you watched close enough, but did you? A. I watched pretty close; I didn't pay much attention to whether he turned around or not. Q. You didn't pay attention to that? A. I was not paying much attention to that. Q. When did you begin dodging down under the trees to watch Platter? A. Just about the time I wondered whether he passed over or not; just at that time the train hit him. Q. Before that time your view of Mr. Platter was obstructed, was not it? A. Yes. Q. And it was obstructed from the time he left Harten's house? A. I just cannot say at what time it was. Q. Well, that was the time your view became obstructed on account of the trees in front of Harten's house, was not it? A. I was watching him from the time I heard the train, wondering whether he was going to stop, or whether he heard it or not. Q. When did you first hear the train? A. When I was going home. Q. Where were you when you first heard it? A. I was just about on Mulberry street. Q. You watched him from that time on? A. Yes; from where I stopped. Q. And there was part of the time you could not see him, was not there? A. No; I don't know whether there was or not. Q. There was part of the time you could not see what he was doing? A. Little ways off from him, yes; I could not see whether he turned his head or not. Q. What is that? A. I saw from the distance. Q. From where you were standing? A. Yes. Q. You could see what he was doing? A. I could see he was standing up. Q. That is all you could see? A. Yes. Q. You could see the outlines of his body? And is that all you could see? A. Yes. . . . Q. Well, now, Mr. Larson, I will ask you

whether or not you remember this question being asked you last term of court when you were examined as a witness in this case: 'About how far north of your home did he pass you? A. Well, sir, about 50 feet he passed me.' A. North of my own home? Q. Yes. A. I don't know; I didn't measure the lots how big they were. . . . Q. Do you remember this question being asked you, Mr. Larson: 'Was he facing in that direction, that is, the southwest? A. He was. Q. As long as you saw him? A. Yes, sir.' 'As long as I could see.' And the next question, 'About how far could you see him, Mr. Larson?' and your answer, 'Well, sir, it was quite dusk at that time, and I had to dodge down under the tree, and I ain't sure in that, because I could not see whether he turned around and looked when he was on the crossing or not, because it was quite dark at that time.' Do you remember giving that answer? A. I cannot remember that I gave it exactly that way. Q. Will you say you did not give that answer? A. No, sir. Q. If you did give that answer, it was true, was not it? A. I suppose so. Q. That is the fact that you didn't see the man from the time he passed out of your sight in front of Harten's house until you saw him just at the moment of the accident? A. I saw him standing in the wagon all the way. Q. That is all you could see; he was standing in the wagon? A. Yes. Q. That is all you know about what he did? A. That is all I know. Q. You say he was driving his horses on a trot when he passed you. You don't know how far he drove at a trot? A. No, sir; I don't. I don't know how far he drove on a trot. Q. You could not say? A. No, sir. Q. I will ask you this question if you remember whether or not this question was asked you at this term of court, 'Or whether he looked in any other direction than to the southwest, you don't know?' and your answer, 'Not after he passed out of my sight that far.' Do you remember making that answer? A. Yes. Q. Well, 'After he got in front of Harten's house?' And your answer 'No.' Do you remember making that answer? A. I don't remember. Q. Do you swear you didn't say that? A. No, sir. Q. And the next question, 'That is true, is not it?' and your answer, 'Yes.' Do you remember answering the question that way? A. I won't say now. Q. And the next question, 'You don't know what he did after that?' and your answer, 'No, sir.' A. Yes; that is correct. Q. You remember making that answer? A. Yes, sir. Q. That was true, was it, that after he passed in front of Harten's

house you don't know what he did? A. No, sir. Q. That is the last time you could judge what he was doing, is not it? A. Well, what he was doing in what way? Q. Except you saw he was standing up? A. He was standing up; that is all. Q. That is all you can say about him after he passed in front of Harten's house? A. Yes, sir.

The testimony of the engineer was as follows:

. . . I saw Platter and his team just before I struck him. I was about twenty feet away. He was standing in his wagon right over the forward wheel, driving two horses. It is pretty hard for a fellow to swear just how fast anything of that kind is; but I think the team was trotting. He was standing in the wagon facing west, and had his back toward me. As soon as I saw the team, and they moved in front of the headlight, I shut off the team and applied the emergency brake. The proper thing to do in a case like that is to shut the steam and apply the emergency brake. I could not stop the train before striking Platter. When I first saw the horses they were about ten or twelve feet from the railroad track. . . . I do not think that I would have a clear view of this curve on Third street from Mulberry street. I never paid much attention as to whether there was any obstruction near Third street. I don't remember whether I could see Third street crossing from Mulberry street. If it is light enough so you can see the curve, you could probably see an object a couple of hundred feet from Third street crossing, when you are going south. I always thought there was a curve between Third street and Mulberry, but do not know how much of a curve. The curve is sufficient so that the track is not in full view from one street to the other. The headlight would not be on the crossing until it got to within a hundred and fifty feet of Third street. . . . All I could do from the time I saw Platter until I struck him was shutting off the steam and putting on the brakes. Just before I saw him I was looking out of the window, with my hand on the throttle. The reason I did not see him before is because he had to come diagonally across the track. The horses were about ten or twelve feet away from the track when I first saw him. I don't think he drove up to this position until the rays of the headlight had passed. . . . When I saw Platter he

had his back to me.   At the last trial I said to the question,
'Had his back toward you?' 'I don't know whether he had
his lines in his hands at all or not, as far as that was con-
cerned; I don't know how he held them.   It was quick done.
I just looked up, and saw there was a man standing there
with his back to me.'   I don't go back of that statement yet.
I say that is correct.   If I said at the last trial, 'I just looked
up,' it is a mistake; I looked out.   I don't want this jury to
understand I took my eyes off looking ahead, for I did not.
I want to insist that I did not make such a statement.   I never
intended to say that I looked up, because I was looking out.
I was on the right-hand side of the engine, and was looking
ahead to see if the track was clear.   .   .   .   I think the team
was trotting, but do not know whether it was slow or not.   I
think the team was going almost as fast as was I.   .   .   .   I
don't know whether I could see the Third street crossing
from Mulberry street or not.   I never paid much attention
to whether there was any obstruction.   In the other trial I
answered that I could not see the Third street crossing from
Mulberry street.   I would not undertake to estimate how
fast we were going in a second.

As part of the cross-examination plaintiff offered the fol-
lowing questions and answers, given on former trial of this
case:   ''Q. Had his back toward you?   A. I don't know
whether he had his lines in his hands at all or not.   As far as
that was concerned, I didn't see how he held them.   It was
quick done.   I just looked up, and saw a man standing there
with his back to me.''

In view of this record, we think it was a fair question for
the jury to say whether or not plaintiff was observed and his
conduct noticed during all the time while he was within the
danger zone, and that the weight and credibility of these wit-
nesses who testified as to their observations of the deceased dur-
ing the time in question was also for the triers of fact.   The
trial court so instructed, and in this there was no error.   This
aspect of the case is ruled by *Gray v. Railroad Co.*, 160 Iowa,
1.   This case is so closely in point that nothing further need
be added.

Aside from this, however, appellant contends that, giving the presumption all the weight to which it is entitled, the testimony is such as to clearly show contributory negligence on the part of the deceased. Ordinarily this question

**8. SAME: contributory negligence.** is for a jury, and it is only in plain cases where a court is justified in holding, as a matter of law, that one killed at a railway crossing is guilty of negligence as a matter of law. A traveler upon a public highway is not bound to look or listen at any particular place, nor is he bound, as a matter of law, to look, especially where his view is obstructed at any given point, as he passes along the highway. The obstructions to his view are to be taken into account, and he also has the right to rely upon the railway operating its trains in accord with the law and ordinances of the city. If failure to do these things is calculated to mislead a traveler, the company cannot complain of his conduct when acting in reliance upon the performance thereof. He has the right to rely upon a burning headlight, when such headlights should be lighted; on the ringing of the bell, and, in exceptional cases within a town, especially where the crossing is a dangerous one, upon the blowing of the whistle or some other warning, and, if he does so, and at the same time exercises the ordinary precautions of sight and hearing, he cannot be held guilty of contributory negligence as a matter of law. In such circumstances the question is one of fact for a jury. The *Gray* case, *supra*, seems to rule this. See, also, *Lockridge v. Railroad Co.*, 161 Iowa, 74; *Dusold v. Railroad Co.*, 162 Iowa, —; *Wilson v. Railroad Co.*, 161 Iowa, 191.

No error appears, and the judgment must be and it is *Affirmed.*

WEAVER, C. J., and GAYNOR and WITHROW, JJ., concur.