STATE OF IOWA, appellee, v. ERNEST TRIPLETT, appellant.

No. 48864.

(Reported in 79 NW2d 391)

340

November 13, 1956.

Rehearing Denied January 18, 1957.

Thomas O. Tacy, of Council Bluffs, for appellant.

Dayton Countryman, Attorney General, Raphael R. R. Dvorak and Dudley C. Lowry, Assistant Attorneys General, William S. Sturges, County Attorney, and Robert E. Beebe, Special Prosecutor, for appellee.

Thompson, C. J.—Jimmy Bremmers, an eight-year-old boy, disappeared from his home in Sioux City about 8 p.m. on August 31, 1954. His badly decomposed body was found in a field in Plymouth County on September 29 following. Medical testimony at the trial showed that the cause of death was two severe wounds in the head, each of which indented the skull. These wounds, according to the expert testimony, could not have been made by a blow from a hand or fist, but must have been caused by striking with a wooden or metal instrument.

The defendant had been in Sioux City for only a few weeks at the time Jimmy Bremmers disappeared. He was on August 31 employed as a door-to-door salesman or solicitor of business by

a music store. His duty was in large part at least to interest parents in music lessons for their children. He had been working in the neighborhood where Jimmy Bremmers resided with his parents on August 31. He drove an automobile owned by his employer and had the use of this in the evenings after his working day had ended. On September 2, when the disappearance of the Bremmers boy had become generally known and a considerable search instituted, the police department of Sioux City received word that a salesman for the defendant's employer had been soliciting business in the Bremmers neighborhood on August 31. Officers thereupon called upon the employer, learned that the defendant was the employee who had been in that part of Sioux City and took him to the police station for questioning.

The defendant was held in the station without charge filed for about sixteen days, during which time he was questioned daily, but apparently not at great length on any one day, about his knowledge of the disappearance of the boy. During this time also, one Joseph Matousec, or Matosek, a private detective in Sioux City, called at the jail and was permitted to question the defendant. Matousec was not employed at that time by anyone, nor was he acting for the police or other authorities or at their request. At the time of the trial he was in the employ of defendant's attorney. When he talked with the defendant at the jail, he told him he thought if he did commit the crime, "very possibly the only thing they could do to him would be to commit him to Cherokee (a state mental hospital) because of his mental condition." The witness was at this time no more than a volunteer investigator, having no connection with any law enforcement authority.

The defendant remained in the custody of the police without charge filed until about September 18, when he was transferred to the mental hospital at Cherokee upon his own application. Testimony of police officers is that he said he thought they might there be able to aid him by treating him for syphilis. There is also testimony that on three or four occasions he said he did not want a lawyer; that he wanted to help solve the Bremmers disappearance. There is also testimony that on September 4, when

all that was known of the matter was that the boy was missing, the defendant said he was interested in co-operating in every way in clearing up "this murder"; and when asked why he referred to it as a "murder" he made no reply.

While the defendant was at Cherokee hospital the body of Jimmy Bremmers was found. Thereupon he was taken from the hospital by police officers and to the place where the body was found. The roadway here is considerably below the level of the field in which the body lay, a short distance from the fence. It was not visible from the road. When the car stopped, there is evidence he at once went in a diagonal direction up the bank to a point outside the fence nearest to the body, without direction from anyone. When he saw the body he turned pale and said "What is that?"

After viewing the body the defendant was taken to the Sioux City police station and kept there for a few days. On October 1 he was visited at the jail by Stanley Corbett, president of the Sioux City Bar Association. Mr. Corbett advised him that if he was being held against his will he was entitled to seek a writ of habeas corpus and the bar association would furnish him counsel. Mr. Corbett testifies: "He said he was not held against his will and he wanted to help the police solve the murder. I told him the bar association would furnish him counsel but he said he did not want to leave the jail or the hospital, whichever place he might be." On cross-examination the witness said that the defendant gave two reasons for staying there: he had no other place to go and he wanted to stay there and work for the police chief in attempting to solve ."this murder."

The defendant was then returned to the Cherokee institution, where on October 6 he confessed to the commission of the crime. The confession was obtained by Doctor Azordegan, one of the hospital physicians. Most of the material questioning was done by Doctor Azordegan, in the presence of police officers and of one Bill Sanguin, a hospital attendant who operated a tape-recording device. This recording was upon the trial played to the jury, and later a juror was instructed in its operation and it was taken to the jury room upon its retirement for deliberation upon its verdict.

While the defendant was in the custody of the police and at the hospital he at all times denied guilt until the date of the alleged confession. There is evidence, however, that he admitted to the police officers that he had on August 31 while in the general neighborhood of the Bremmers home seen a boy answering Jimmy's description, and that in the evening he had picked up the boy, who rode on the running board of the defendant's car a short distance to the Bremmers home; and that the boy said he was going to run away. No bloodstains or fingerprints were found on the car, and there were no bloodstains on defendant's clothing which he had worn on the day in question.

■ I. We turn to a consideration of the errors assigned for reversal. The first is that the confession was clearly involuntary as a matter of law, and should not have been admitted in evidence. The defendant urges strenuously that the Fourteenth Amendment to the Constitution of the United States was violated because he was held so long without a charge filed, and he was denied due process thereby. Of course the length of time he was held in custody without being taken before a magistrate to answer to a charge duly filed was much too long. Such a practice cannot be approved. But we have held that this, in itself, does not render a confession involuntary. It is an indicia of violation of constitutional rights but not conclusive proof. We pointed out in State v. Archer, 244 Iowa 1045, 1058, 58 N.W.2d 44, 51, that holding a suspect illegally makes a confession obtained during this period of illegality inadmissible in the federal courts. McNabb v. United States, 318 U. S. 332, 340, 63 S. Ct. 608, 612, 87 L. Ed. 819. But this is a matter of practice rather than of constitutional right. State v. Archer, supra; Gallegos v. Nebraska, 342 U. S. 55, 72 S. Ct. 141, 145, 96 L. Ed. 86. Under the circumstances here, where there is substantial evidence that the defendant preferred to stay in the jail or the mental hospital and refused an offer of legal aid when it was tendered to him several days before the confession was made, we cannot say the detention without charge did more than make a question of lack of due process through involuntariness of the confession, for the jury.

■ The defendant does not testify or claim that any threats or promises were made by the police. We have said that the

witness Matousec had no official connection; in fact at the time of the trial he was employed by the defendant. What he said to the defendant about escaping with no more than some time spent in the mental hospital did not profess to come from anyone in authority. It was no more than speculation, a volunteered opinion not binding upon anyone.

■ There is testimony from the defendant that Doctor Azordegan told him, prior to the making of the purported confession, that "You are in here for being crazy, you are going to be in here for the rest of your life." Also that the doctor said if he admitted the crime "it would help me out and he would get me finally on a job over there, and that I wouldn't be in there any more than about two years." The defendant also suspected the doctor may have administered some "medicine" which made him sleepy and "I didn't feel natural." However, there is no other evidence of the administering of drugs and we think other testimony sufficient to make at least a jury question of defendant's normal mental condition so that he understood fully the nature of the confession. Turning to the alleged promises made by the doctor, no one other than the defendant claims to have heard them, and since the record shows Doctor Azordegan was at the time of the trial out of the United States there could be no denial. But the jury was not bound to take the defendant's testimony as true, even in the absence of contradiction. We have repeatedly so held. In Schulte v. Ideal Food Products Co., 203 Iowa 676, 677, 678, 213 N.W. 431, 432, we said:

■ "We have consistently held that a mere failure to produce direct contradiction to the testimony of a witness does not necessarily entitle such testimony to be deemed true. It must still stand the test of credibility, in the light of all the circumstances surrounding the transaction. *This is particularly true in those cases where, from its very nature, no evidence is available to the adverse party to contradict such testimony."* (Italics supplied.)

To the same effect are Gilmer v. Neuenswander, 238 Iowa 502, 506, 507, 28 N.W.2d 43, 46; Dibel v. Meredith, 233 Iowa 545, 557, 10 N.W.2d 28, 34; Platter v. Minneapolis & St. L. R.

Co., 162 Iowa 142, 151, 143 N.W. 992, 996. The rule is especially applicable in the case at bar, since Doctor Azordegan was at the time of trial beyond the jurisdiction of the court, and the defendant's vital interest in the case is evident, making the credibility of his testimony peculiarly subject to scrutiny.

The defendant cites and relies much upon Leyra v. Denno, 347 U. S. 556, 74 S. Ct. 716, 98 L. Ed. 948. Here a confession had been obtained from a defendant charged with murder, by a psychiatrist. The defendant was in custody charged with the murder of his father and mother. He was suffering from sinus trouble and was told that he would be furnished medical treatment therefor. But the doctor sent to him was a psychiatrist, who proceeded to question him at length, using his knowledge of mental processes and finally convincing him that he should admit the crimes. The New York Court of Appeals, People v. Leyra, 302 N. Y. 353, 98 N.E.2d 553, held this confession inadmissible, but admitted other confessions made a short time later. The United States Supreme Court, with three Justices dissenting, held the later confessions also tainted. But in the case at bar the defendant knew the doctor questioning him was a specialist in mental processes. There is no evidence of undue pressure or use of hypnotism or other special devices or questions calculated to overcome the will of the subject. The confession contains statements from the defendant that it was made voluntarily and without threats or promises. We find the situation so much different from that prevailing in the Leyra case that we hold it not in point. On the whole record we think the question of voluntariness was properly submitted to the jury, and its determination must be final.

II. Error is further assigned upon the court's ruling which permitted the tape recording to be taken to the jury room when it was deliberating. Whether the point is now available to the defendant is in serious doubt, since his counsel at first agreed the recording might be so used. But shortly after the jury had retired objection was made on the grounds that there was no competent operator, and further that to permit the playing of the record in the jury room would give undue prominence to this feature of the testimony. Whether objection could be lodged at

this time is a serious question; but we have decided to consider the matter on its merits. The question is an open one in Iowa, but we find no merit in the assignment. A member of the jury panel was instructed in the operation of the machine, in the presence of defendant's counsel. It is not now contended, except by the objection, that the juror who was so instructed was not competent to operate the device, which is a comparatively simple procedure. In the absence of any showing that it was not properly operated, we give no further consideration to this part of the objection.

The only objection made to the admission of the recording in evidence was, in effect, that it was not voluntary, for reasons specified. The defendant cites Wright v. State, an Alabama Court of Appeals case found in 79 So.2d, pages 66, 71. Here parts of the recording were not clearly audible, and the court held that the reproduction of the statements of the defendant were not shown to be accurate. For this reason it was held inadmissible; but the court said that where the accuracy of the reproduction was shown, together with the voluntary character of the confession, "there can be no question as to the admissibility of a recorded statement * * *"; citing 168 A.L.R. 927. In the case at bar there is ample evidence of the accuracy of the recording, and in fact the defendant stipulated that a transcript of the recording might be made and read into evidence, and this was done.

The real complaint here is that the recording should not have been taken to the jury room and there played during the deliberations. While we have not previously passed upon this exact question in Iowa, we find State v. Gensmer, 235 Minn. 72, 81, 51 N.W.2d 680, 685, 686, to be squarely in point. Here a statement had been taken from the defendant prior to the trial. This was introduced in evidence through a device known as a "soundscriber" and the record therefor. These were taken to the jury room, and error assigned therefor. The Minnesota Supreme Court said:

"The statement was taken from defendant by means of a recording machine, and later a transcript of the statement was taken from the record. That is the modern substitute for a state-

ment in longhand. It accomplishes the same purpose, but more expeditiously and more correctly. Defendant complains that the recording machine may be started and stopped at convenience and it does not record the conversations which took place when it was not in action. That observation can with equal force be made with reference to statements taken in longhand. No one questions that statements in longhand which have been properly received in evidence may be taken by the jury into the jury room. We can see no reason why the mechanism and the mechanized version of the statement may not also be received in evidence. In the latter case, no one can question the accuracy of the reproduction of the statements made by the person being questioned."

We are satisfied with the logic of the holding of the Minnesota court, and accordingly find no error at this point.

■ ■ III. Defendant also complains of the admission of three photographic exhibits. Each of these showed the body of Jimmy Bremmers lying in the field where it was found, with the skull apparently separated from the torso. It is defendant's contention that the photographs served no purpose other than to inflame the minds of the jurors. If this were the sole purpose, the contention would necessarily be upheld. But the pictures showed another matter, which we think at least brought them within the fair discretion of the court as to their admissibility. It has been said above that certain police officers testified that when the defendant was taken to the road adjoining the field in which Jimmy Bremmers was found, and before it had been removed, the body was not visible from the road; but that the defendant alighted from the car and at once climbed the bank beside the road and stopped at a point on the boundary fence nearest to the body. The pictures each show the locale as described by the officers, with the field lying considerably higher than the roadway. They demonstrate the truth of the testimony that the road immediately opposite the point where the body lay goes through a cut, with the fence separating the road from the field running along the top of a bank which prevents a view of the field from a car traveling along the highway. The photographs were clearly competent and material in showing the situ-

350

ation. They bore directly upon the weight and credibility of the testimony of the officers which tended to show that the defendant knew of the approximate location of the body which he could not see from the road. If there was a just reason for permitting these exhibits to be introduced in evidence, the incidental fact that they were gruesome, that they tended to injure the defendant's case would not make their admission erroneous. Legitimate evidence may not be excluded because it may tend to arouse the feelings of the jurors. State v. Stansberry, 182 Iowa 908, 912, 166 N.W. 359, 360, 361.

 The trial court has a considerable discretion in determining the admissibility of demonstrative evidence, and its rulings may not be reversed in the absence of an abuse of such discretion. State v. Stansberry, supra; State v. Christie, 243 Iowa 1199, 1210, 53 N.W.2d 887, 892, 893.

 IV. Assigned Errors Nos. IV and V are similar in nature and will be discussed in the same division of this opinion. We would be justified in refusing to consider these assignments, since they state alleged improper questions asked by the prosecuting attorney, and evidence claimed to have been improperly admitted, without referring to the pages of the record which show these incidents. We are left to search the entire record to determine whether it substantiates counsel's statements in the assigned errors and in his argument. But, since this is a criminal case in which the defendant was convicted of a serious offense, we have taken upon ourselves the burden of making the required search.

(a). Upon cross-examination, the defendant was asked: "Do you know a Captain Green, in Omaha?" Upon objection being made as to the competency, relevancy and materiality of this question, the State's attorney said: "Your Honor, I feel that the matters which are being brought up now are certainly of a serious nature * * * ." Motion was then made to strike this statement, coupled with a request that the jury be admonished not to give it any weight. The objection was sustained and the jury admonished as requested.

In the same cross-examination, the defendant having said that he had told certain police officers that he had been married

to one Doris Spencer, he was asked: "* * * would you state whether or not you told the police that Doris Spencer was a prostitute?" Objection was made and promptly sustained by the court.

It is now the contention of the defendant that these questions injected such prejudice into the case that their evil effect could not be overcome, although answers were not permitted. It is to be noted that no request for a mistrial was made; the motions and objections of the defendant in each case were promptly sustained, and it must be assumed that at the time he was satisfied with the situation as it stood. There was nothing further the court was called upon or requested to do. Nor do we think the matters injected into the case by the questions and the statement of counsel were so prejudicial that we must say the court abused its discretion in refusing to grant a new trial because of them. The trial court has a considerable discretion in determining whether there has been misconduct of counsel or, if so, whether this has resulted in such prejudice as to deny a defendant a fair trial. The questions and the remark of counsel do not seem to have been such as to reflect any particular obloquy upon the defendant. We think this situation comes well within the rule laid down in State v. Wheelock, 218 Iowa 178, 182, 254 N.W. 313, 316, and followed in State v. Jensen, 245 Iowa 1363, 1367, 66 N.W.2d 480, 482. Other cases are cited in State v. Jensen, supra, at page 1368 of 245 Iowa, page 482 of 66 N.W.2d.

(b). Further complaint is made of the admission into evidence of testimony of William A. Dennison, lieutenant of detectives in the Sioux City police department concerning a conversation he had with the defendant shortly after he was first taken into custody on September 2, 1954. We find the record shows this: That Dennison testified that the defendant told him that at one time, for about a four-year period, he was a user of marijuana; that on the night of August 31, on which Jimmy Bremmers disappeared, he had smoked a marijuana cigarette in his hotel room; that the smoking of these cigarettes stimulated him sexually, and that he had committed acts of sexual perversion with both men and women.

The confession admitted in evidence contains this: "* * * Are you playing with boy? A. Yes. Q. What kind of play was it? Kiss him, did you play with his hair? A. I kissed him and loved him up, and he didn't seem to mind so much. * * * Q. But do you remember you started to open his pants? A. Yes. Q. For what intention did you open his pants? A. Whether I thought he was a girl or a boy I didn't know. Q. * * * As soon as you started to open his pants what he did? What action he did? A. He started to run away from me."

Later in the confession is this: "Q. And when you drove him out to the country, Ernest, that's what you had in your mind, to have a little party with him? A. Yes."

 It is the contention of the defendant that the introduction of the evidence of his use of marijuana and of his admissions of acts of sodomy with others was improper. If so, of course it was highly prejudicial and must be held to constitute reversible error. But we think the evidence properly admitted. It leads plainly to the establishment of a motive for the killing of the boy, always an important consideration in criminal cases. Marijuana is a drug known to arouse the passions of its users, leading not only to stimulation of the sexual desires but to acts of cruelty and violence. The testimony of Lieutenant Dennison, coupled with the statements in the confession, supplied an important link in the State's case. The test is not whether it was harmful to the defendant, but whether it was error to admit it. If it was material and competent, the fact that it hurt the defendant is of no avail to him. Evidence which has a material bearing on the issues in a criminal prosecution is admissible, even though it may tend to show the defendant guilty of another unrelated offense. Here the statement of other acts of sodomy was a part of the conversation between the defendant and a police officer. It was not offered to show another offense, but as a part of the entire conversation, an admission apparently volunteered or willingly made by the defendant himself. State v. Crisman, 244 Iowa 590, 596, 57 N.W.2d 207, 210, 211; State v. Campbell, 209 Iowa 519, 522, 228 N.W. 22, 23; State v. Burzette, 208 Iowa 818, 824, 825, 222 N.W. 394, 397.

V. Other errors assigned are general in nature and are

answered by the discussion in the preceding divisions. We have carefully examined the record, and find nothing therein which indicates the defendant did not have a fair trial by due processes of law.—Affirmed.

BLISS, GARFIELD, HAYS, OLIVER, PETERSON, and SMITH, JJ., concur.