OTTO SOHL, Administrator, Appellant, v. CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY, Appellee.

**RAILROADS:** Contributory Negligence. Contributory negligence
1  *per se* results from the act of a mature man, in full possession of his senses, driving, on a clear day, upon a country railway crossing, with which he was perfectly familiar, and in front of a rapidly approaching train, of which he had, for a distance of 230 feet from the track, an unobstructed view for at least 1,000 feet.

NEGLIGENCE: No-Eyewitness Rule. The presumption "of due
2 care in the absence of eyewitnesses" cannot prevail when the
undisputed physical facts demonstrate that the said presump-
tion was not true in fact. So held where a mature man, in full
possession of his senses, and on a clear day, drove in front of a
rapidly moving train, of which he had, for a distance of 230
feet from the track, an unobstructed view of 1,000 feet.

RAILROADS: Rate of Speed at Country Crossings. One may not
3 rely upon any particular speed of trains at non-obscured, ordi-
nary country railway crossings and will not be permitted to
escape the consequences of his negligence in gambling on his
ability to pass ahead of trains, of the approach of which he has
ample notice and knowledge.

*Appeal from Scott District Court.*—A. J. House, Judge.

May 13, 1918.

Action for damages resulted in a directed verdict for
defendant and judgment thereon. The plaintiff appeals.—
*Affirmed.*

*Chas. B. Kauffmann,* for appellant.

*F. W. Sargent* and *Cook & Balluff,* for appellee.

Ladd, J.—I. A line of the defendant's railway extends
from Davenport in a southwesterly direction through Rock-
ingham and Nahant. Between these latter places is what is
known as the Nahant crossing, where the highway, running
north and south, passes over the railway.
1. RAILROADS : contributory negligence. The angle is 115 degrees. Besides the west-
bound, or north, track, and the east-bound
track below it, there is a side track to the south. The
railway is about 5 feet above the surface, the highway for a
distance of 70 feet north of it having a 7% grade.

Shortly after 10 o'clock in the morning of March 30,
1915, Ernst Sohl was driving, in a southerly direction, an
auto truck with beer for delivery at Nahant, and, as he
reached the center or east-bound track, he was struck by

a passenger train coming from the southwest, and killed. The plaintiff, a brother, as administrator of decedent's estate, alleged in the petition that the defendant was negligent: (1) In operating the train at an excessive speed, (2) in failing to sound any warning of its approach, and (3) in not keeping a proper lookout. There was no evidence tending to support the last-named ground of negligence. A verdict was directed for defendant solely because of the court's conclusion that the evidence was insufficient to warrant a finding that decedent was without fault on his part.

He was 22 years of age, in full possession of all his senses, and entirely familiar with the crossing and its approaches. The day was clear, and, according to the evidence, he might have seen, had he looked, the approach of the train at a distance of 1,000 to 1,200 feet from the crossing. True, there were some willow trees north of the north right of way fence. There was a clump of these near the highway, and then none for nearly 200 feet west, and then trees. At that particular season, these were without leaves, and, as photographs disclose, interposed little or no obstruction to seeing a train approaching from that direction. These trees were 95 feet from the east-bound track. Another row of trees, close together, was 230 feet from the track, and still another, over 600 feet therefrom. Telegraph poles, with 5 cross-arms and numerous wires, extend along the right of way about 32 feet north of the tracks. The highway fences were about 60 feet apart. There was an icehouse near the track, 1,259 feet southwest of the crossing, and the whistling post, 1,526 feet. One could not see a train until past the second row of trees, 230 feet from the track; but, from that point on, the evidence is undisputed that a clear vision of a train when beyond the icehouse was available to anyone who looked. But two of the four witnesses who saw the col-

lision testified. Paulson, who was scraping a motor boat about 200 feet southwest of the crossing, was asked:

"Q. Now, that was not a solid row of trees, was it? A. No, sir. Q. There were some little willow trees in a separate cluster, then an open space? A. Yes, sir. Q. Then some little willow trees farther down along the fence? A. Yes, sir. Q. Then an open space? A. Yes, sir. Q. Then another cluster of little willow trees along the fence? A. Yes, sir. You can see plainly the icehouse there and the railroad track in front of it for a distance of 1,000 or 1,200 feet west of this crossing, and you can see that all the way from the time you are 250 feet north of the crossing, traveling down the highway. That would be looking in the direction from which the said train was coming the day this accident happened. At any point from a distance of 250 feet of the railroad, traveling down that highway towards the track, you could look towards the icehouse and railroad track and see the track there. You could see it perfectly plainly and conveniently, and you could see that track down at least 1,200 feet to the icehouse. As a matter of fact, you could see beyond that, after you got behind the second row of trees. After you passed that road, as a matter of fact, you could see plainly down there, I guess pretty nearly half a mile. It is straight track."

The other witness, Robert Jager, who was standing near a pigpen across the highway almost directly east from the second row of trees, testified that he saw the decedent driving the auto truck towards the railway track from about a half mile north until struck; that it was going 6 or 8 miles an hour; that he heard the rumble of the train as it approached; that he saw the train when beyond the icehouse, as it came in a northeasterly direction; that he was somewhat higher than the railway; that, when a person reaches the right of way, he can see down the track a long distance.

"There were some trees there that have been chopped

down since. I do not know if they would have obstructed the view much if they were there. I think you could see. That would be my best judgment. Q. After you got by that second row of trees, do you think at times you would have had a view of the track down there? A. I think you would,—yes, sir."

The testimony of these witnesses is in harmony with conditions as shown by other evidence, including photographs, and leaves no doubt that the decedent, if he looked, must have seen the approaching train. The railroad crossing was a place of danger, and he was bound to look and listen before going upon the track. Had he done so, he must have seen the approaching train; and whether he looked or failed so to do, he was equally negligent in driving in front of the rapidly approaching train, which was in plain sight.

II. Counsel for appellant argue that, inasmuch as no witness undertook to describe what decedent did in the way of exercising ordinary care, he should be presumed to have been prompted by the natural instinct of self-preservation, and to have done so.

2. NEGLIGENCE: no-eyewitness rule.

Jager testified to having observed decedent from a half mile north of the track until struck. Whatever he did then, aside from looking or listening, this witness must have seen; and, according to his story, decedent drove, without stopping, in front of the approaching train. Of course, the decedent might have looked and listened without others' observing his doing so. His instinct of self-preservation could have prompted him to do no less than look out or listen for an approaching train, as he neared the railway tracks. The situation was such that, in looking out for his own safety, he must at least have looked or listened after passing the second row of trees; and, had he done so, he would have had ample warning of the approach of the train. Conceding that he did all that the promptings for his own safety required, the undisputed evidence discloses

that, notwithstanding this, he proceeded, in the face of warnings he must have had, directly into the perilous situation where he lost his life. No aid is to be derived from resort to the presumption of due care, if the facts are such that, had it been exercised, the collision must have been avoided.

Neither *Dalton v. Chicago, R. I. & P. R. Co.,* 104 Iowa 26, nor *Gray v. Chicago, R. I. & P. R. Co.,* 143 Iowa 268, is in conflict with this conclusion, nor are other cases which are relied upon. In the former decision, the collision occurred on a dark night, at 3:50 o'clock A. M., in the absence of any witnesses; and in the latter, there was evidence tending to show that the view of the track was obstructed, and there was no witness as to what plaintiff's decedent did, much of the way in approaching the crossing. For all that appears, he drove on heedlessly to his own destruction.

III. It is argued, however, that the evidence was such that decedent might, as an ordinarily prudent person, have concluded that he could pass over the tracks before the train reached the crossing. Paulson estimated that the train was moving 75 or 80 miles an hour, while Jager thought it going "about as fast as I ever saw." And Mueller, who was riding on the train, said it was going at a fairly good rate of speed. The track was level and straight. The topography of the land about the crossing was not such as to exact a limit on the speed. The crossing was in the open country, though between the village of Nahant and the town of Rockingham. Conditions were such that one about to cross the tracks might not rely on any particular speed of a through passenger train. *Hartman v. Chicago Great Western R. Co.,* 132 Iowa 582; *Bruggeman v. Illinois Cent. R. Co.,* 147 Iowa 187.

3. RAILROADS: rate of speed at country crossings.

While a railway company may not operate its trains over highway crossings at such a speed as, in view of local

conditions, will endanger the lives of those prudently making use of these, a traveler is not permitted to make nice calculations as to whether he will be able to pass over in front of a rapidly approaching train in safety. The latter is under the same duty of exercising ordinary care to avoid a collision as is the company. The degree of care to be observed by each is to be measured by the threatened danger, and the traveler is no more excusable for risking himself before an oncoming train than the company is in running him down, when it knows, long enough beforehand to enable it to avoid the collision, that he cannot or will not get out of its way. Both Paulson and Jager observed and heard the approaching train before it struck the auto truck. Because of the noise of the latter, decedent might not have heard; but, had he looked, he must have seen the train. With the auto truck under control, as it should have been in such a situation, he could have stopped in moving only a few feet. As said, he might not rely on any particular speed of the train, and therefore could not enter into nice comparisons as to relative speeds of the train and the auto truck, and as to whether he would be able to escape injury if he undertook to cross over ahead of the train. The train has the right of way, and he may wait until it passes; and, where the track is straight, clear, and level, and his view unobstructed, if he goes upon the crossing in front of an approaching train, he does so at his own risk. The law will not permit of such experiments with danger, at another's risk.

The case is readily distinguishable from *Burnett v. Chicago, M. & St. P. R. Co.*, 172 Iowa 704; as there, the night was dark, and the injured was deceived by the dimness of the headlight as to the distance of the train. Street car cases are distinguishable by the difference in situations. See *Adams v. Union Elec. Co.*, 138 Iowa 487.

The undisputed evidence disclosed that the day was clear and the sun shining, the railroad straight and level,

and the decedent's view was unobstructed, as he approached the east-bound track for a distance of 230 feet north therefrom. He must be assumed to have seen the approaching train; for, in the exercise of ordinary care, he was required to look, and had he looked, he must have seen, as did Paulson and Jager. The evidence also discloses that, though he saw the train coming at high speed, he drove in front of it and was killed; and, in the light of these findings, there is no escape from the conclusion that, in so doing, he was careless of his own safety, and therefore guilty of such contributory negligence as will defeat recovery by the administrator of his estate.

There was no error in directing the verdict for defendant.—*Affirmed.*

PRESTON, C. J., EVANS and SALINGER, JJ., concur.