P. J. BROWN, Administrator, Appellant, v. WILLIAM G. McADOO, Director General of Railroads, et al., Appellees.

**RAILROADS:** Accidents at Crossings—Negligence per se. A passenger 1 is guilty of negligence *per se* when, on a clear day and without distracting circumstances, he permits the conveyance in which he is riding to be driven upon a railroad crossing with which he is perfectly familiar, when his view of an approaching train from a point 50 feet from the crossing is unobstructed for over 200 feet, and he neither looks nor listens for an approaching train.

**NEGLIGENCE:** "No Eyewitness" Rule. No presumption of care 2 on the part of an injured person can be indulged when his movements are observed up to a fraction of a second before he is injured.

*Appeal from Clay District Court.*—N. J. LEE, Judge.

MAY 9, 1922.

REHEARING DENIED FEBRUARY 17, 1923.

PLAINTIFF, as administrator of the estate of John A. Brown, brought this action to recover damages for the death of said John A. Brown, who was killed when a Ford automobile in which the said John A. Brown was riding, in company with one Frank L. Putnam, collided with a passenger train in charge of defendant railroad, at a highway crossing southeast of Spencer, Iowa, on July 29, 1918. At the close of all the evidence, on motion of defendant, the court directed a verdict for defendant, and entered judgment for costs against plaintiff. Plaintiff appeals.—*Affirmed.*

*Heald & Cook* and *Cornwall & Cornwall,* for appellant.

*Hughes, Sutherland & O'Brien* and *J. W. Cory & Son,* for appellees.

ARTHUR, J.—I. The petition alleges three grounds of negligence, to wit, excessive speed of the train, failure to sound the whistle until within about 300 feet of the crossing, and failure

1. RAILROADS: accidents at crossings: negligence *per se.*

to ring the bell until within about 50 feet of the crossing. The answer was a general denial and an allegation of negligence on the part of the deceased, John A. Brown.

At the point of the accident, the line of railway runs almost due north and south, and the highway runs east and west. The country in the vicinity of the crossing is flat and approximately level. For one half to three quarters of a mile south of the crossing, where the right of way emerges from the river hills, it is a flat, level country. About a mile west of the crossing is a river, which courses from north to the south and southeast. From the railroad west to the river the land is level, and it is level to the north and to the east. There is no cut in the track for over a mile south of the crossing. The track south of the crossing is graded up slightly by ballast. The highway running east and west passes over level ground. The ground along the roadway up to the track is fairly level.

Plaintiff, as a witness, testified that the highway east from the first bridge, which is 575 feet west of the crossing, and up to the crossing, was rutty; that the ruts were from "three inches to a foot deep, and snake trails;" that "within 75 feet of the track the road was smooth, but humpy, and by straddling the ruts either way, there was a comparatively smooth track."

A witness for defendant, Otto Bjornstad, testified that the roadway from the lane leading to the house on the farm south of the highway, which lane is 250 feet west of the crossing, was in good condition for a distance of probably 200 feet; that the road was dry; that there was no mud; that there were some dry ruts; that the road nearer the track was better than it was farther back; that "for at least 100 feet back from the track there were no ruts;" that west of the right of way and south of the highway lay a field, in which there was growing corn at the time of the accident, about ten feet high; that the field which was planted to corn was flat and low, but inclined higher to the east toward the railroad right of way; that there is a rise in the land south of the highway on the west side of the

track, beginning at the second bridge, which is 1,500 feet west of the crossing, and extending east and south; that there were willow trees along the south side of the highway and west of the first bridge, eight or nine feet high at the time of the accident, which were thickly leafed; and that there were no gaps in this willow hedge, except a gap perhaps about 30 feet wide, where the lane enters the premises from the highway to the improvements, the house, barn, etc., about 250 feet west of the crossing. These willows extended west from the first bridge about 100 feet. East from the first bridge, where the willows left off, there was a plum thicket on the south side of the road. From about 425 feet west of the right of way and south, are located the barn and house and sheds, and there were trees among the improvements, in irregular position.

II. Brown and Putnam were driving east on the highway. Putnam was going out into the country to buy some horses, and plaintiff's decedent, Brown, accompanied him on the trip. The record shows that "deceased, Brown, was going out to show him [Putnam] where the horses were." Brown had been out on such trips with Putnam before. Sometimes he had been paid for his services, and sometimes not.

It is not disputed that, to a traveler on the road journeying east, the view to the north was free and unobstructed. A traveler going east on the highway could look northeast from about 1,500 feet east of the track, and would have an uninterrupted view of a train to the north for a mile. It is not claimed that there were any obstructions on the right of way that would obstruct the view to the south. It was 50 feet from the right-of-way fence to the track. Plaintiff testified:

"When you are 50 feet from the railroad track, you could see the rails 200 or 300 feet."

Plaintiff's witness Wallace Hargrave testified:

"Standing 75 feet west of the crossing, you could see a train 200 feet down the track. The row of willows ended about 50 feet west of the right-of-way fence, or 100 feet west of the track."

A few feet west of the right-of-way fence, 8 or 10 feet, stood a small tree, and about 25 feet west of the right-of-way fence was a larger tree.

L. Howe, witness for defendant, testified:

"Standing in the center of the highway 60 feet west of the track at this time, I would say you could see a train south 30 or 40 rods."

Defendant's witness E. C. Fee testified:

"If you stood 70 feet from the track, you could see half a mile down the track."

Fee was a member of the coroner's jury, which viewed the premises the day after the accident. Fee further testified:

"The first place—that is, the farthest place—from the track where one could look through, was the place between the big willow and the small trees which were near the track. Then, a little closer to the track, one would be behind these two small trees for a short space, and then you would come into full view of the track; and from that point, which is 60 feet from the track, your view would be unobstructed."

A witness called by plaintiff, who lived in the vicinity of the accident and who traveled the road frequently, testified that, as a person traveled along towards the track from the point where the willow trees began, west of the first bridge, a train approaching from the south could not be seen until one came out on the railway right of way,—that is, the edge of the right of way, 50 feet from the track; although Wallace Hargrave, called by plaintiff, testified that, "standing 75 feet west of the crossing, you could see a train 200 feet down the track."

Defendant introduced in evidence a photograph (defendant's Exhibit No. 1), which is before us, taken with the camera located 60 feet west of the track, and in the center of the highway. The lens of the camera was 5 feet from the ground. In this picture, the same train is shown that was involved in the accident, and the camera caught the train when it was running, coming north, about 600 feet south of the highway.

III. The accident occurred about the middle of the afternoon, on July 29, 1918. Putnam and Brown left Spencer shortly after noon, and their movements until observed by the witnesses are not disclosed by the record. It was Putnam's car, and he was driving. Wallace Hargrave and his nephew, Donald Hargrave, were cutting oats in a field north of the highway, and about 90 rods west of the track. The ground where the Har-

graves were is 4 or 5 feet above the general level of the country, and they were running a binder, and were on the binder, 4 or 5 feet up off the ground. They saw the car, with these two men in it, pass east along the highway, and they watched it until the time of the accident. They thought the two men in the car were brothers of Wallace Hargrave's, and one of them the father and the other the uncle of Donald Hargrave; and this gave them special interest in watching them. They knew that the train had not passed along yet, and they watched the automobile with these two men intently from the position they occupied on the binder. They say that, when the car passed along the road opposite them, it was traveling 15 or 20 miles an hour. They say that the road from the first bridge to the crossing was rutty; that the ruts were from 3 or 4 inches to a foot deep; and that a Ford car could not be driven in that space in safety at more than 5 miles an hour; and they say that the car slowed up, after it left the first bridge, which is 575 feet west of the right of way.

While no witness so testified, counsel for both parties assume in their arguments that Putnam was driving the car, and that he was on the north side, and that Brown was on the south side, or the side the train came from. Both men were sitting in the front seat of the car. Brown was familiar with the crossing. For more than 7 years he had traveled over all the country near Spencer, buying stock.

The fireman on the train testified that, when he first saw the car, it was about 50 feet from the track, and traveling 20 to 30 miles an hour. He said:

"There were two men in the car. They were not looking toward me or toward the engine. They appeared to be talking to each other. The train was then about 100 or 150 feet from the auto."

He said that he kept his eye on them until they disappeared in front of the engine at the instant of collision.

Wallace and Donald Hargrave testified that they watched the automobile from the time it passed them until the instant of collision; that they thought the men in the car were relatives, and they saw that the automobile and train were going to reach the crossing at about the same time. Wallace Hargrave said:

"I watched the train and automobile intently at the time, thinking it was my brothers, for one thing, and it seemed they were coming pretty close together. During this time, I was watching for the train. After the train went in behind the trees, I looked at the automobile. I could not tell for sure, from where I stood, whether the train actually hit them or not. I thought it did."

Counsel for appellant claim that the record brings into application the presumption that Brown, deceased, did what an average, reasonable, and prudent person would ordinarily do, under the circumstances by which he was surrounded, and that such question should go to the jury, for the reason that no living witness saw the car and the men in the car at the instant of collision; that, by reason of distance, the Hargraves were unable to observe the acts and conduct of deceased with respect to his own safety; and that the fireman, by reason of his view's being shut off by the engine in which he was riding, did not see the actual collision; and that the jury should be permitted to consider the instinct of self-preservation. We have examined the record carefully, and the authorities on this point, and conclude that appellant is not entitled to invoke the rule of no eyewitness. We think that, under the record, no inference of care can be indulged in in favor of the deceased; for there were eyewitnesses to the accident. Both of the Hargraves and the fireman, Jansen, were looking at the car and the men in it until the very instant of collision. These three persons testified in regard to the movements of the car. The two Hargraves testified that they watched the car intently, for the reason that they thought the men in the car were their relatives, and they could see that the car and the train were going to reach the crossing at about the same time. It is true that they were not sure that the car had been struck, but that was because the car was partly over the track when the train hit it, and was thrown to the east side of the track by the collision. The train then hid it from their view, and it was not until the train passed over the crossing that they knew for a certainty that the accident had occurred. The fireman saw the car, and observed the conduct of the occupants. His testimony covered every movement for the

<p style="margin-left:2em">2. NEGLIGENCE: "no eyewitness" rule.</p>

last 50 feet as they approached the track. He saw that they were not looking in his direction at all, but that they had their heads together, as though they were talking to each other. While he did not see them at the exact instant of the collision, it is entirely clear from the record that but a fraction of a second could have intervened from the time they passed out of his sight until the actual impact occurred. We think that, under the record, no inference of care can be indulged in in favor of deceased; for there were eyewitnesses to the accident. *Bussler v. Chicago, M. & St. P. R. Co.,* 165 Iowa 361; *Ames v. Waterloo & C. F. R. T. Co.,* 120 Iowa 640; *Thompson v. Chicago G. W. R. Co.,* 162 Iowa 468; *Golinvaux v. Burlington, C. R. & N. R. Co.,* 125 Iowa 652.

Perhaps it is logical to first consider appellant's position that deceased John A. Brown was a passenger, riding in the automobile of deceased Frank L. Putnam; and that he was not engaged in a joint venture, and is not chargeable with any negligence, if any, on the part of the driver, Frank L. Putnam. We do not need to consider the question whether Brown and Putnam were engaged in a joint venture, or whether Brown was simply a passenger; for we think such question is not controlling in the instant case. The important and controlling question at this point is whether or not Brown was under the same duty of exercising ordinary care as they approached the crossing as was Putnam, the driver of the car. Brown was familiar with the crossing. He was on the south side of the car, the side from which the train approached. He had ample time to see the train and warn the driver of its approach; and, according to the undisputed evidence, the car could easily have been stopped, and the accident avoided. According to the undisputed testimony, Brown was not looking in the direction of the train, and he did not look to the south at any time during the last 50 feet. It is the duty of a passenger on the front seat in an automobile, approaching a railroad crossing, to use his senses and to look and listen, to determine whether there is danger from an approaching train. It is also his duty to act as a man of ordinary care and prudence, under the circumstances, in doing all those acts and things which a man in his situation might reasonably be required to do under the same

or similar circumstances, to avoid the threatened injury. Both driver and passenger approaching a railroad crossing must exercise ordinary care. In the instant case, there was an eyewitness to the accident, in the person of the fireman of the train. He saw appellant's intestate as he approached the crossing, and testifies positively that he did not look in the direction of the train at all. It is therefore established that he did not exercise ordinary care. *Beemer v. Chicago, R. I. & P. R. Co.,* 181 Iowa 642; *Morris v. Chicago, B. & Q. R. Co.,* 101 Neb. 479 (163 N. W. 799); *Brommer v. Pennsylvania R. Co.,* 179 Fed. 577; *Howe v. Corey,* 172 Wis. 537 (179 N. W. 791); *Willfong v. Omaha & St. L. R. Co.,* 116 Iowa 548.

This brings us to the vital question of whether or not the record shows that plaintiff's decedent was guilty of contributory negligence, as a matter of law. This question involving, as it does, consideration of the testimony on defendant's motion to direct a verdict, the evidence must be considered in the aspect most favorable to plaintiff. Ordinarily, this question is for a jury, and it is only in plain cases that the court is justified in holding, as a matter of law, that one killed at a railway crossing is guilty of negligence. *Platter v. Minneapolis & St. L. R. Co.,* 162 Iowa 142.

Appellant asserts that these men, as they traveled east on the road toward the railway track, could not see the train with which they collided approaching from the south, on account of obstructions, consisting of trees, buildings, and cornfield, until they came out on the railway right of way. Defendant claims that the record shows that the travelers came into full view of the track and the train as it came up from the south 200 or 300 feet down the track, when they came within 70 or 60 feet of the track. There is also some claim on the part of defendant that there was a gap or two in the trees, where the travelers might have had a view of the train. After examining the oral testimony and that furnished by the photographs, we are inclined to think that the track for at least 200 feet, and the train at a considerably farther point, were in view from a point 60 feet west of the track: that is, about 10 feet west of the west side of the right of way. But considering the evidence in the most favorable light for appellant, we must come to the conclusion,

on the motion to direct a verdict for defendant, that the men riding in the automobile, by reason of obstructions south of the road and west of the right of way, were unable to observe a train approaching from the south until they reached the right of way, 50 feet from the track.

On such basis, then, what was the duty of plaintiff's decedent, as he approached the place where his view to the south became unobstructed,—that is, the west edge of the right of way, 50 feet from the track? The evidence shows without dispute that these men had been over this road many times before, and that they must have known that they were approaching the railroad track. When they reached the point 50 feet west of the track, their view to the south became unobstructed. Unquestionably, it was then the duty of Brown to look to the south, to see if a train was approaching from that direction. Even though Putnam, the driver, took no precaution whatever, if Brown had looked to the south he could have warned Putnam, and the car could have been stopped and the accident avoided. It is shown in the record, without dispute, that a car moving at a speed of 20 miles an hour could have been stopped in from 15 to 20 or 22 feet, and one going 10 miles per hour, could be stopped in 10 feet. It must be recalled that it was defendant's witness, the fireman, who testified that the car was moving at from 15 to 20 miles an hour, during its travel within the right of way. Plaintiff claims that the car was moving much slower. A witness for plaintiff, Donald Hargrave, testified that he drove a Ford car over that place on the day of the accident, and that a Ford car could not be driven with safety, owing to ruts in the road at that place, at a speed of more than 5 miles an hour; and counsel for plaintiff argue from that, that the car was moving at only about 5 or 6 miles an hour. Considering the situation on that basis, it must be conceded that the car could have been stopped within a very few feet. The roughness of the road at that place, considering it to be full of ruts, as claimed by plaintiff, afforded more resistance than a smooth road to the progress of the car, and would have aided in stopping the car. Neither Brown nor Putnam looked to the south. They were engaged in conversation, and seemed to be totally oblivious that they were approaching the track, and that a train running at 50 to 60

miles an hour was nearly upon them. They did nothing to attempt to avoid being struck by the train until the very instant that the front wheels of the car were about to pass over the track. This is shown both by the testimony of eyewitnesses and by the physical facts of the situation, found after the accident. Members of the coroner's jury and farmers living in the vicinity of the crossing testified that there were marks in the roadway which showed that, just about the time the front wheels of the car reached the west rail of the railroad track, the driver had turned the car sharply, and it moved in a northeasterly direction from that point until struck by the engine. They testified that the tracks of the wheels of the automobile were visible, and that, at a point about 10 feet west of the rails, there was a distinct mark in the highway where the dirt was thrown to the south, as one of the witnesses put it, showing that the car had been whipped over to the left. This testimony indicates that, just as the front wheels of the car were about to pass over the west rail of the railroad track, the men discovered the train which was then upon them, and that the driver turned the car to the left sharply enough so that the rear wheels flipped the dirt to the south. The left front wheel passed over the north end of the crossing planks, and made a mark between the rails a little more than halfway across. The rear left wheel showed a mark for a short distance on the edge of the planks. There the tracks ended. This would put the car just a little more than halfway across the track when the engine struck it. Evidently this fact, together with the momentum of the car, resulted in its being thrown to the east side of the track and north of the highway. We are constrained to reach the conclusion, from the testimony of the eyewitnesses and the physical facts shown in evidence, that plaintiff's decedent, Brown, failed to exercise any care whatever in approaching this crossing. As before stated, he was riding on the south or right-hand side of the car, the direction from which the train approached. The train was plainly within his vision during at least the last 50 feet which he traveled. There were no obstructions upon the right of way, to prevent his seeing the train. Even the rails were in plain sight for at least 200 feet. If Brown had just turned his head and looked to the south at the point where his view to the south became

unobstructed, the tragedy would have been averted. Putnam was an experienced driver. The car was new, and in good working order, and could have been stopped within 15 to 22 feet, if it were going at the fastest speed testified to, and if going at a lower rate of speed, as claimed by plaintiff, it could have been stopped in a much shorter distance.

The general situation and the facts in the recent case of *Ballard v. Chicago, R. I. & P. R. Co.*, 193 Iowa 672, are very similar to those of the instant case. While not controlling, our holding in that case strongly supports our conclusion in the instant case. We reach the conclusion that the trial court did not err in directing a verdict for defendant, and the judgment on the verdict is affirmed.—*Affirmed*.

STEVENS, C. J., EVANS and FAVILLE, JJ., concur.