GRACE WASSON, Administratrix, Appellant, v. ILLINOIS CENTRAL RAILROAD COMPANY et al., Appellees.

**RAILROADS:** Accidents at Crossings—Negligence Per Se. A traveler is guilty of negligence *per se* in approaching and going upon a railway crossing on a clear day when he was perfectly familiar with the crossing and when the track on which a train was approaching was in plain sight for three fourths of a mile. (See Book of Anno., Vol. 1, Sec. 8018, Anno. 40 *et seq.*)

**NEGLIGENCE:** Evidence—Presumption Arising from Human Instinct. The presumption that the instinct of self-preservation caused a traveler who was killed by a train at a crossing to look for a train before he went upon the crossing has no application when it affirmatively appears that, had he looked at any time while he was in the zone of danger, he must have seen the train.

VERMILION, J., dissents, on the record presented.

Headnote 1:  33 Cyc. pp. 982, 995, 1000.  Headnote 2:  33 Cyc. p. 1073.

Headnote 1:  1 A. L. R. 203; 41 A. L. R. 405; 22 R. C. L. 1034; 3 R. C. L. Supp. 1301; 6 R. C. L. Supp. 1348.  Headnote 2:  22 R. C. L. 1054.

*Appeal from Woodbury District Court.*—A. O. WAKEFIELD, Judge.

APRIL 5, 1927.

Action by the administratrix for damages for the death of the decedent, who was struck and killed by a train at a railway crossing. At the close of plaintiff's evidence, the court directed a verdict for the defendants, and from a judgment thereon the plaintiff appeals.—*Affirmed.*

*Fred H. Free, E. G. Smith,* and *R. A. Oliver,* for appellant.

*Helsell & Helsell* and *Henderson, Fribourg, Hatfield & Fribourg,* for appellees.

FAVILLE, J.—But one question is presented upon this appeal, and that is whether or not the court erred in directing a verdict in behalf of the appellee. We are required to view the evidence in the light most favorable to the ap-

1. RAILROADS: accidents at crossings: negligence *per se.*

pellant, under such circumstances. Appellant's intestate was in the employ of the city of Sioux City, as driver of a garbage wagon. The garbage dump where the decedent disposed of his load is situated east of what is known as the Floyd River Road, at Sioux City. Said road, at the point in question, runs north and south, and is parallel to and on the east side of the appellee's right of way. The railroad track where it crosses Nineteenth Street runs straight north from said point for a distance of at least three quarters of a mile. The accompanying photograph shows the situation at the crossing in question, looking north.

The distance from the center of the track east to the Floyd River Road is 83 feet. At the time of the accident in question, appellant's intestate approached Nineteenth Street from the west, on the Floyd River Road. He had traveled a distance of 385 feet on said Floyd River Road, going north. He turned to the west upon Nineteenth Street. This brought him at right angles to the railroad track. Farther west are other tracks, as shown in the photograph, the nearest of which is 30 or 40 feet west of appellee's track. There were no tracks east of the tracks of the appellee. There was no obstruction on the track of the

appellee or along the road or right of way between the railroad track and the Floyd River Road, except two lines of telegraph or telephone poles, as shown in the photograph. The decedent was driving a heavy team, drawing an empty garbage wagon. During the time he was driving on the Floyd River Road, he was going directly opposite to the direction from which the train was approaching, and parallel to the track, and 83 feet therefrom. When he reached Nineteenth Street, he turned to the west, and proceeded to the crossing, where he was struck by the appellee's train, coming from the north. It was a clear, bright, sunshiny day. The wind was blowing from the northwest at the rate of about 23 miles an hour. The decedent was thoroughly familiar with the crossing, and had traveled over it about four times a day for a year or more, in connection with his work. The collision occurred about 11 o'clock in the forenoon. The evidence shows that the train was moving at about the rate of 40 or 45 miles an hour, as it approached the intersection with Nineteenth Street, and shortly before the collision, decedent was traveling at a speed of 4 or 5 miles an hour. There was evidence tending to show that, at the time the decedent turned west from the

Floyd River Road into Nineteenth Street, he appeared to be looking to the west. No one testified as to just what he did on Nineteenth Street from the time he was about 38 feet distant from the crossing until he was struck. A witness who was about 200 feet behind the decedent testified that the decedent was sitting on the seat of the wagon, looking to the west, after he had made the turn onto Nineteenth Street. This witness did not see the collision, nor did he see the approaching train. The witness testified that, when he last saw the decedent, the team was walking. Another witness testified that he saw the decedent just a second or two before the train struck him; that he saw daylight between the decedent and the train; that there was a lot of smoke and dirt, at the time the decedent was struck, near the crossing; that the smoke appeared as though it was coming from switch engines, working up at Twenty-second Street, from the same direction as the train was coming. On cross-examination, the witness testified that, at the time of the accident, there was no smoke at the crossing, and he could see the decedent very plainly. Another witness testified:

"I was near the railroad crossing on October 18, 1923, when the scavenger man was killed. I was driving a truck at that time. I saw the engine strike the team, wagon, and man. I was about 50 feet south from it. I was coming up Floyd River Road from the south, on my way to make a delivery, when all at once I saw this train approaching, and in direct line with my vision I saw this man and team, and that he was going to get hit, if something miraculous did not happen. I tried to save the man. I put on all speed to the truck; started my siren to blowing. When I was about 50 feet from him, the train hit him. When I first saw this train, it was about 200 feet from the man, coming from north toward south. There was a stiff breeze blowing from the northwest, and there was dirt, dust, and smoke and grit in the air. When I first saw the train, its appearance was a cloud of smoke. There was plenty of smoke over and about the train, but not far ahead of it. * * * The smoke I saw obstructed the view to some extent. The engine was emitting all of this smoke, and from my experience I knew what caused this amount of smoke,—it was the fireman firing at that time. I could not see him firing, but I could see the results of his firing,—a dense black smoke. The man who was killed was driving his team to

the west. He was standing up in the wagon box. I do not know which way he was looking at that time.''

On cross-examination, he said:

''My attention was called to this train some distance north of the crossing, and I was a block south. The train was about a block north of the crossing. Mr. Wasson was within a short distance of the track. His team was walking, at about 4 or 5 miles an hour. I had no occasion to get this vision of any kind until the train came into my vision, and at that time Mr. Wasson was just going on the track. I put on all speed, and tried to save him by blowing my horn. I was going about 12 miles an hour at the time, and I presume I was going about 20 or 25 miles an hour when the impact came. I went a distance of 150 feet before the train struck him,—it might have been more, it might have been less. It is fair to say that did not average more than 20 miles an hour in that 150 feet. He might have gone one fourth that far, or about 28 feet, before the train struck him. There was nothing between him and the train. He was almost directly between me and the train, and was standing up in his wagon. The wind was blowing about 25 miles an hour, and the top of the train was almost obscured from view by its smoke. There was not enough smoke to keep me from recognizing it as a train, when it was a block north and I was a block south of this crossing. I do not know why I knew he did not or could not see this train; it is almost an intuition that comes over one. I made all the noise I could to warn him, because it was apparent that he was not paying any attention to the train and did not see the train. As far as I could see, he was facing west. That is the reason I blew the siren on my auto. Some of the smoke came down in front of the engine.''

With regard to the conditions respecting smoke and dust at the crossing at the time of the injury, the evidence shows:

Martin, a witness who was driving a car or wagon northward on Floyd River Road, testified that, as he approached Seventeenth Street, he saw a ''load of smoke settling down there from the switch engines working across the Illinois Central track;'' that he stopped at Seventeenth Street, on account of the smoke settling there; that he could not see anything, and had to stop because he was afraid of colliding with someone; that, about a

minute after he stopped, he heard a crash that appeared to be at the Nineteenth Street crossing. He said:

"I should judge that this smoke extended as far as the Twenty-second Street crossing, at the time I stopped there."

He testified that after the accident he observed a switch engine standing close by the Nineteenth Street crossing, and that the smoke he saw in the road came from the switch engines north and west of the Illinois Central track. On cross-examination, he said:

"What the condition was up there north before the accident with reference to the view, I could not say now. If you mean up there at Twenty-second Street, there was a lot of smoke."

Cooley testified:

"At the time I turned from Seventeenth Street onto Floyd River Road, I looked up the track, and there was smoke and dust up the track at or near the Nineteenth Street crossing. This smoke appeared as though it was coming from switch engines working up at Twenty-second Street. This smoke was coming apparently from the same direction as the Illinois Central train came that hit Wasson."

He also said:

"There was a pretty good breeze blowing, and there were times when this would clear the air of smoke, and that was the reason I could see Mr. Wasson as he came up to the track and as he got on the track."

Hoxie testified:

"At the time I came up to this crossing, I observed smoke to the north. It was strung up and along down there. The smoke that was across the track came from some of these engines. There was smoke there across the Illinois Central track at that time as far south [north?] as Twenty-second,—some three blocks."

He further testified:

"That smoke that morning blinded a person upon your view to the north. By blinded, I mean to say that that obstructed the view to the north."

The witness Mason, who made the ineffectual attempt to warn the deceased, and said he saw the train a block north of the crossing, testified:

"There was some smoke in front of the engine as it would drive down from the stack. The smoke I saw obstructed the

view to some extent. The engine was emitting all of this smoke.''

On cross-examination, he said:

''There was no smoke in front of the train. I could see all of the engine from the bottom of the stack down, when it was a block south of the crossing.''

On re-direct examination, he testified, without objection:

''The conditions that indicated that this train was not seen by Mr. Wasson were that there was dirt and grit and dust flying around out there between Mr. Wasson and the engine.''

He further said:

''As I saw the train approaching, the smoke I would say was driven over the stack in a volume, and I myself could not see any of the upper part of the engine or the train. It was a dense black smoke from a fresh fire in the fire box, and falls to the ground more rapidly than lighter smoke.''

We have set out briefly the substance of the evidence in the case most favorable to the appellant. It appears that the decedent was thoroughly familiar with the crossing in question, and approached it in broad daylight on a clear day, and approached it at right angles for a distance of 83 feet. While traversing that distance with the team on a slow walk, there was nothing to prevent him from looking to the right in the direction of the approaching train where there was a straight view of the track for the distance of approximately three quarters of a mile, with no intervening obstructions whatever except the smoke and dust about the crossing. It is apparent that a large amount of the smoke was from the approaching train itself. Other witnesses,—two at least,—who were farther from the approaching train than the decedent, saw it before the collision, and under circumstances which, if the decedent had observed the train, would have afforded him ample opportunity to avoid the collision.

It is true that ordinarily the question of contributory negligence is one for the jury; but where the circumstances surrounding the transaction are not in dispute, and the evidence establishes the fact of contributory negligence, it then becomes a question of law for the determination of the court. It is true that the decedent was not required to look for an approaching train at any particular point as he approached the crossing. The rule is that of ordinary care under all the circumstances; but where, as in the case at bar, the decedent approached a

known railroad crossing, with no buildings or other obstructions to interfere with his view, and drove at right angles to said crossing a distance of 83 feet, with a team at a slow walk, and where those observing him until he was within a distance of 38 feet of the track saw that he made no effort to look in the direction of the approaching train, we think it must be held, as a matter of law, that he was guilty of contributory negligence in driving upon the crossing in front of the approaching train.

The presumption that the instinct of self-preservation caused him to look after he passed the point 38 feet from the crossing cannot avail appellant. Decedent did not look before he reached a point 38 feet from the track. If he looked thereafter, he could have seen the train and averted the injury, unless he did not look until he was too close to avoid the collision. If he waited until such time, he was guilty of negligence in not looking sooner, as he had ample opportunity to do.

2. NEGLIGENCE: evidence: presumption arising from human instinct.

The evidence in regard to the smoke and dust about the crossing is not such a diverting circumstance as to have relieved the decedent of liability for contributory negligence. The smoke of the approaching train, which the evidence tends to show blew from the smokestack in front of the engine, was of itself a warning of the approaching train, rather than an excuse to the decedent for failing to exercise due care as he approached the crossing. *Claar Transfer Co. v. Omaha & C. B. S. R. Co.*, 191 Iowa 124; *Henderson v. St. Louis & S. F. R. Co.* (Mo. App.), 248 S. W. 987; *Heaney v. Long Island R. Co.*, 112 N. Y. 122 (19 N. E. 422); *Fannin v. Minneapolis, St. P. & S. S. M. R. Co.*, 185 Wis. 30 (200 N. W. 651).

No two cases are, of course, alike under their facts; but, as bearing somewhat upon the question of contributory negligence under facts analogous to those in the case at bar, see *Landis v. Inter-Urban R. Co.*, 166 Iowa 20; *Crawford v. Chicago G. W. R. Co.*, 109 Iowa 433; *Brown v. McAdoo*, 195 Iowa 286; *Anderson v. United States R. Adm.*, 193 Iowa 1041; *Ballard v. Chicago, R. I. & P. R. Co.*, 193 Iowa 672; *Swearingen v. United States R. Adm.*, 191 Iowa 1096; *Yanaway v. Chicago, R. I. & P. R. Co.*, 195 Iowa 86.

We reach the conclusion that the court did not err in direct-

ing a verdict in behalf of the defendant, and the judgment appealed from must be, and it is,—*Affirmed.*

EVANS, C. J., and STEVENS, DE GRAFF, and ALBERT, JJ., concur.

VERMILION, J., dissents.

VERMILION, J. (dissenting).—I am of the opinion that the appellant was entitled to the benefit of an inference, or presumption, arising from the instinct of self-preservation on the part of the decedent, and that this was sufficient to carry the question of his contributory negligence to the jury.

It is well settled that, where there are no eyewitnesses to an accident resulting in death, the inference arising from the instinct of self-preservation is sufficient to sustain the burden of proof, in the first instance, that the deceased was not guilty of contributory negligence. *Dalton v. Chicago, R. I. & P. R. Co.,* 104 Iowa 26; *Christopherson v. Chicago, M. & St. P. R. Co.,* 135 Iowa 409; *Korab v. Chicago, R. I. & P. R. Co.,* 149 Iowa 711; *Wilson v. Chicago, M. & St. P. R. Co.,* 161 Iowa 191. In *Platter v. Minneapolis & St. L. R. Co.,* 162 Iowa 142, we said:

"Again, it is a rule of this court that the presumption of care arising from the instinct of self-preservation does not apply where there are eyewitnesses of the entire transaction, nor will it obtain if the physical facts and uncontradicted circumstances show that deceased could not have exercised the care required of him at the time of the accident."

In that case we held that it was a fair question for the jury whether the deceased was observed and his conduct noticed during all the time while he was within the danger zone.

In *Gray v. Chicago, R. I. & P. R. Co.,* 160 Iowa 1, we expressly approved the application of the doctrine, where there were intervals during which the conduct of deceased was not observed by any eyewitness. We said:

"They were not long intervals, yet we cannot say, as a matter of law, they were insufficient to do what reasonable care required at his hand by way of precaution for his own safety."

There was testimony that decedent was thoroughly familiar with the crossing, and that he was a careful driver with reference to the crossing. In *Frederickson v. Iowa Cent. R. Co.,* 156 Iowa 26, we said of such evidence:

"It may tend to aid the presumption of self-preservation that arises in such cases, because a person is more likely to do what he is in the habit of doing under the same conditions."

I think it should not be said, as a matter of law, that the interval while decedent traveled more than half the distance from Floyd River Road to the crossing, and during which his conduct was not observed by any eyewitness, was not sufficient, either in point of time or circumstance, for him to have exercised due and reasonable care for his own safety. *Gray v. Chicago, R. I. & P. R. Co.,* supra. It cannot be said that he did not look during that interval, nor, under the evidence as to the presence of smoke and dust to the north of the crossing, that, if he then looked, he must have seen the approaching train.

The jury might have found that the train was being operated at an excessive rate of speed, and without signaling its approach. It might have been found that, although decedent looked at any time during the interval when his conduct was not under observation, and when, under the authorities cited, a presumption exists that he exercised due care, no train was then observable, owing to the dust and smoke, for such a distance that he was justified in proceeding without again looking, and that he could have crossed in safety if the train had been running at a reasonable and proper speed. If it was so found, he was not required, as a matter of law, to look again when nearer the crossing. *Wolfe v. Chicago G. W. R. Co.,* 166 Iowa 506. He was not bound to look or listen at any given point. *Case v. Chicago G. W. R. Co.,* 147 Iowa 747; *Davitt v. Chicago G. W. R. Co.,* 164 Iowa 216.

Under the doctrine that a presumption or inference of the exercise of due care arises from the instinct of self-preservation, where there are no eyewitnesses of the conduct of a decedent during an interval when he might have fulfilled the duty of exercising such care for his own safety, I think the question of contributory negligence was for the jury, and that the judgment below should be reversed.