WILLIAM TEGTMEYER, Administrator, Appellant, v. H. E. BYRAM et al., Appellees.

**RAILROADS:** Accidents at Crossings—Negligence Per Se. A competent and experienced driver, with good sight and hearing, and without diverting circumstances, is guilty of negligence *per se* in slowly driving, in the daytime, a well conditioned, brake-equipped automobile upon a railway crossing with which he was perfectly familiar, at a time when a plainly visible train was rapidly approaching and loudly whistling when he was from 100 to 60 feet from the crossing. (See Book of Anno., Vol. I, Sec. 8018, Anno. 33 *et seq.*; Vol. II, Sec. 8018.)

**RAILROADS:** Accidents at Crossings—No-eyewitness Rule—Non-applicability. The presumption of care which may be indulged in case of an accident of which there is no eyewitness has no application when the record affirmatively shows that the accident would not have happened, had the injured party exercised reasonable care.

Headnote 1:  33 Cyc. p. 1004.  Headnote 2:  17 C. J. p. 1304.

Headnote 1:  1 A. L. R. 203; 41 A. L. R. 405; 22 R. C. L. 1034.

*Appeal from Hancock District Court.*—J. J. CLARK, Judge.

DECEMBER 13, 1927.

Action for negligently causing the death of plaintiff's intestate in a railroad crossing accident. Judgment on directed verdict for defendants. Plaintiff appeals.—*Affirmed.*

*J. E. Williams* and *W. G. Henke,* for appellant.

*Wichman & Hastings* and *Hughes, Taylor & O'Brien,* for appellees.

MORLING, J.—There are the two usual questions in the case: First, whether defendant was negligent; second, whether deceased was negligent. The accident occurred about 8 A. M., August 10, 1925, at a highway crossing some 600 or 800 feet west of the built-up portion of Hutchins, a hamlet of 25 inhabitants. The defendant's line of railroad runs east and west, north of such built-up portion. South of the railroad, and 50 to 200 feet from it, is a paved rural east and west highway. Proceeding westwardly from the buildings making up Hutchins, this highway gradually approaches the railroad, and at a point 125 feet southeastwardly from the crossing, takes a more definite curve, crossing the railroad in a northwestwardly direction at an angle of about 45 degrees. The crossing is over a single main-line track. A few feet east of the crossing is a switch for a passing track, which branches off to the south, and proceeds eastwardly, paralleling the main track for a half mile or more. 150 feet east of the crossing, a house track branches south from the passing track, and proceeds eastwardly, paralleling the other two tracks. At the time of the accident, there was upon this house track, 400 feet east of the crossing, a box car. This was the most westwardly obstruction to the traveler's vision of the tracks. Immediately eastwardly of the box car, and south of the house track, was a corncrib, 48 feet long. 150 feet east of the corncrib was an elevator. This was also on the south side of the house track. These were the only obstructions to the vision of the traveler proceeding westwardly toward the crossing that are material to this controversy.

Deceased was traveling westwardly through Hutchins to the crossing. The evidence is that, as she arrived at a point 100

1. RAILROADS: accidents at crossings: negligence per se.

feet from the crossing, she would have an unobstructed view of 682 feet of the track east. When she arrived at a point 75 feet from the crossing, she would have an unobstructed view of 935 feet of the track. At 50 feet from the crossing, she would have such a view of 1,500 feet of track. As she drew near the crossing, at about 8 A. M., the defendant's regular passenger train from the east was approaching, making no stop at Hutchins. It was about 2 minutes late. Its speed, as estimated by defendants' witnesses, was 45 or 50 miles per hour. The trainmen say, 35 or 40 miles per hour. The station building was 890 feet east of the crossing, on the north side of the main track. The whistling post for the crossing was 376 feet east of the station, 1,266 feet east of the crossing. There is dispute in argument as to whether the whistle was sounded either for the station or at the whistling post for the crossing, or whether the bell was rung, plaintiff contending for the negative.

In our view of the question of contributory negligence, we need not be detained with a consideration of the question of defendant's negligence.

Decedent was alone, in a left-hand-drive inclosed car, which the evidence shows was in excellent condition, and the brakes of which "were in fine shape." She was 18 years old, an experienced and good driver, and familiar with the crossing. Her hearing and eyesight were good. The day was clear and still. Decedent was first observed in the vicinity of the elevator, about 650 feet from the crossing, driving westwardly at 15 or 18 miles per hour. She was also observed as she neared the crossing. All of the witnesses say that the whistle of the approaching train was sounded when the engine was at the corncrib, or about the depot, the corncrib being substantially 450 feet east of the crossing. It is true that the engineer's testimony is somewhat confusing, but it shows that he sounded the whistle twice between the elevator and the crossing, the last one a continuous blast until the crossing was reached. He does not say he did not whistle at the corncrib. He says:

"Between the corncrib and the elevator and the crossing, I gave one long blast of the whistle. That whistle was for three or four car lengths. It was wide open until I passed the crossing. The occasion of that whistle was, my fireman said there was a car coming. I sounded the whistle again. * * * I think

possibly I was close to two car lengths from the crossing when my fireman said there was a car coming. We were past the depot, way down near the crossing. I would not give any definite distance from the crossing,—we were not looking for distances,—it might have been anywheres from 120. feet—along in there. I got my whistle and the brake set before I got to the crossing.''

Plaintiff's witness Weiland was in the dump of the elevator, holding his horses, having a view of the train westwardly from elevator. He says, ''The engine was right opposite the corncrib when it whistled,—that is, on the north side.'' Plaintiff's witness Mrs. Thompson says:

''I heard the train whistle. I think it was around the depot, as near as I can tell, at the time it whistled. From the time I heard the whistle to the time it crossed the crossing was just an instant, you might say, most,—that is the way it seemed to me.''

Plaintiff's witness Miller testified:

''I first saw the train when it was right in front of me, between the elevator and corncrib. I heard the whistle,—in my estimation, it was between the corncrib and the elevator when I heard the whistle. * * * I would say it did not stop whistling until it went across the crossing.''

Defendants' witness Boyson testified:

''When I saw the train, it just come past the elevator. It started to blow the whistle just as the engine passed the elevator. * * * I saw it when it was by the corncrib. I heard it whistle, real shrill,—could hear it plainly; then it continued to whistle, clear to the crossing.''

We turn to the matter of decedent's opportunity to see the approaching train. Plaintiff's contention, in brief, is that, with the train going at 50 miles per hour, and the automobile at 6 miles, the driver of the automobile, at 90 feet south of the crossing, could see east along the track for about 733 feet, at which time the train would be 750 feet from the crossing; that decedent could then have reasoned that, as she was then only 90 feet from the crossing, and there was no train within 733 feet, she would have ample time to get over; that it must be presumed that she listened, and heard no whistle for the whistling post, and it may be found that she heard none; that the curve was a

diverting circumstance, and she was thereupon justified in giving her entire attention to the control of the car, and was not called upon to again look, within the brief space at which the train traveling at 50 miles per hour would reach the crossing.

It may be said, in the first place, on the evidence before us, that, if the automobile were going at only 6 miles per hour on the curve, and the train were going at 50 miles, the accident could not have happened. We think, also, that it is impossible to explain the accident on the basis of computations of comparative rates of speed, or on any reasonable hypothesis that the decedent could, within reasonable distance, have looked, and not seen the train. The evidence as to rate of speed is purely a matter of opinion. The word "instant" is relative, and, in connection with the exciting circumstances referred to by the witness who used it, has little meaning. The facts testified to by the witnesses and the physical conditions must govern. In examining the facts, we find that Mrs. Thompson was in her house, about 200 feet southeast of the crossing, and 75 feet south from, and a little east of, the curve in the highway. The windows and door were closed. She observed decedent and the train through her north and west windows. Her vision was northwardly, and decedent was northwestwardly from her, driving, as witness says, not over 8 or 10 miles per hour.

"I just looked out of the window as I saw her driving round the curve and drive up to the railway, and almost at the same instant I saw the train coming, and I thought at first maybe that they missed. I saw her drive around the curve. * * * When I first observed her, she was about 60 or 70 feet from the crossing; as near as I can judge, driving around 8 miles per hour. I don't think she speeded up her car as she approached the crossing; she drove about the same speed from the time I saw her, and did not increase or decrease her speed, as I noticed. I first saw the train when it passed the north window in the room. It would then be back of the second switch,—not very far back,—and east, east of the crossing and the switch, on the part which is called the passing track. * * * If anything, I would say it was faster than 45 or 50 per hour."

It will be noticed that this witness says that she saw decedent driving round the curve and up to the railway, and almost at the same instant she saw the train coming, and that decedent,

when first observed by her, was about 60 or .70 feet from the crossing. . The decedent was northwest. of the witness, and decedent's vision, though she: might have had to turn a little to her right, was as free and unobstructed as that of the witness. In fact, she could see a considerable distance along the main track farther than the witness. The witness in the closed house heard the whistle, and no reason is shown why the decedent could not have heard it. The evidence is that the automobile at that point, 60 feet south of the crossing, could have been stopped in 6 feet. The witness so testifying said he thought "there would be a difference between 8 to 10 miles per hour of 4 to 6 feet or less."

Plaintiff's witness Weiland was in the dump part of the elevator, having a view to the west. He says that he saw decedent's car on the highway, ready to make the turn, driving around 6 to 8 miles per hour. He first heard the rumble of the train when it was about at the depot.

"I first observed the automobile about the time I heard the rumble of the train first. It was making the turn on the pavement, to approach the crossing. I think it was farther than .60 or 70 feet from the crossing at that time. I think from 80 to 85 feet."

If we apply a rule to plaintiff's map drawn to scale, it appears that a traveler on the highway at a point 100 feet southeast of the crossing, looking past the west end of the box car, could have seen an engine on the main track opposite the east side of the corncrib.

There was no diverting circumstance, for the curve in the highway cannot be said to be such. It was very gradual. The road was paved. It was mostly straight. The last 75 or 80 feet before reaching the crossing were practically on a straight line. This court said, in *Sohl v. Chicago, R. I. & P. R. Co.*, 183 Iowa 616:

"Conditions were such that one about to cross the tracks might not rely on any particular speed of a through passenger train. * * * While a railway company may not operate its trains over highway crossings at such a speed as, in view of local conditions, will endanger the lives of those prudently making use of these, a traveler is not permitted to make nice calculations as to whether he will be able to pass over in front of a rapidly

approaching train in safety.   The latter is under the same duty of exercising ordinary care to avoid a collision as is the company.   The degree of care to be observed by each is to be measured by the threatened danger, and the traveler is no more excusable for risking himself before an on-coming train than the company is in running him down, when it knows, long enough beforehand to enable it to avoid the collision, that he cannot or will not get out of its way.''

On the evidence of plaintiff's own witnesses, decedent, a normal person, of sufficient maturity to know and appreciate the danger, possessed of good eyesight and hearing, a competent and experienced driver, nothing occurring to divert her attention, drove a well conditioned, brake-equipped car, at a steady and moderate speed, athwart the known pathway of an approaching train, which was loudly whistling, and plainly visible at all times after she reached a point 100 to 60 feet from the track. That therein she was not reasonably careful admits of no doubt. She could have brought the car to a stop within a space of 12 feet.   On the undisputed evidence and physical facts, she either did not look or listen, or she proceeded recklessly into a place obviously dangerous.   If an emergency was created, it was when she got to the crossing, and her failure to use ordinary and reasonable care contributed to it.

The presumption obtaining in favor of a deceased when there are no eyewitnesses is not applicable, because, on the physical facts and undisputed evidence, the collision would have been avoided if decedent had made such reasonably prudent use of her faculties of observation as her knowledge of the surroundings and the evidence of danger from the presence of the track warned her to make.   *Sohl v. Chicago, R. I. & P. R. Co.,* 183 Iowa 616.   The general rules governing such cases are too well settled to justify repetition.   Each case, as has been frequently said, must be decided largely upon its own facts.   As supporting our conclusion, see idem; *Brown v. McAdoo,* 195 Iowa 286; *Reynolds v. Inter-Urban R. Co.,* 191 Iowa 589; *Hawkeye Oil Co. v. Chicago, M. & St. P. R. Co.,* 197 Iowa 694; *Wasson v. Illinois Cent. R. Co.,* 203 Iowa 705.—*Affirmed.*

2. RAILROADS: accidents at crossings: no eyewitness rule: non-applicability.

EVANS, C. J., and DE GRAFF, ALBERT, and WAGNER, JJ., concur.